ALBERT FERRARESE AND RUTH FERRARESE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ferrarese v. Commissioner
Docket No. 14544-91
United States Tax Court
T.C. Memo 1993-404; 1993 Tax Ct. Memo LEXIS 414; 66 T.C.M. (CCH) 596; September 2, 1993, Filed *414 Decision will be entered under Rule 155. Held: P wife is an innocent spouse as to 1981 and 1982, but not as to 1983. See sec. 6013(e), I.R.C.
For petitioners: John R. Serpico. For respondent: Peter J. Labelle. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: By notice of deficiency, respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions to Tax Sec. Sec.
Sec.
Sec.
Year
Deficiency
6653(b)
6653(b)(1)
6653(b)(2)
6661(a)
1981
$ 258,720
$ 129,360
--  --
--  1982
245,269
--  $ 127,778
[1]
$ 61,317
1983
195,176
--  97,588
[1]
48,794
The only remaining issue is whether petitioner Ruth Ferrarese qualifies as an innocent spouse, pursuant to section 6013(e). Hereafter, petitioner, in the singular, will refer to petitioner Ruth Ferrarese. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT At the time the petition was filed *415 herein, petitioners resided in Coral Springs, Florida. Between 1975 and 1983, petitioner Albert Ferrarese (Albert) was a vice president, client accounting manager, with Benton & Bowles, Inc. (Benton & Bowles), an advertising agency located in New York City. During that period, Albert embezzled roughly $ 3.5 million from Benton & Bowles. Between 1981 and 1983, the years at issue, Albert embezzled in excess of $ 1.3 million. On January 12, 1984, Benton & Bowles learned of the embezzlement and terminated Albert's employment. On January 26, 1984, Albert was indicted for grand larceny of over $ 2 million from Benton & Bowles. Subsequently, he pled guilty. Benton & Bowles instituted a civil suit against Albert on January 23, 1984, to recover the roughly $ 3.5 million in embezzled funds. The suit was settled on May 11, 1984. As part of that settlement, Albert signed a document entitled "Confession of Judgment", whereby he admitted owing in excess of $ 3.2 million to Benton & Bowles as a result of his converting Benton & Bowles' funds to his own use. Albert concealed his embezzlement from petitioner until January 1984, after his employment was terminated but prior to his indictment. *416 Albert deposited the embezzled funds into a bank account (the account) in the name of William Morris. The embezzled funds, at that point, consisted of checks issued by Benton & Bowles, payable to the order of William Morris. Albert procured those checks by fabricating and approving invoices purportedly issued by the William Morris Agency, Inc. (a vendor frequently performing services for Benton & Bowles). Albert concealed the existence of the account from petitioner until January 1984. All withdrawals from the account were in cash. Albert spent substantial portions of the embezzled funds on tickets to shows and sports events, and made similar expenditures for clients, their families, and Benton & Bowles executives. Albert concealed from petitioner the fact that he purchased such tickets from embezzled funds. Albert also gave substantial portions of the embezzled funds to family members (other than petitioner), including his uncle, for whom he purchased a home, and his sister, who lived in Italy. Albert concealed those gifts from petitioner. Each year, petitioners went on a 4- or 5-day trip to Las Vegas, to celebrate their anniversary. Sometimes, during such trips, Albert *417 purchased clothing and jewelry for petitioner. Albert brought petitioner along with him to various company functions during the years at issue. Prior to 1981, Albert invited several guests, including petitioner, to a Frank Sinatra concert, at a cost of $ 1,000 a person. During the years at issue, Albert purchased tickets to several football or hockey games, and to a Broadway play, for his wife and sons. In 1985, petitioners sold their house in Massapequa Park, New York, which they held jointly (as they had previous houses), and purchased a house in Merrick, New York. The Merrick house was purchased solely from the proceeds obtained from the sale of the Massapequa Park house. The Merrick home was purchased in petitioner's name only. At the time of trial, petitioners resided in a condominium in Florida owned solely by petitioner. Petitioners timely filed their joint returns for each year at issue. Petitioners filed their joint 1983 return in April 1984. Petitioner did not actually sign a return for any year at issue, but acquiesced in Albert's signing such returns on her behalf. Petitioners did not report the embezzled funds in the years at issue. The deficiencies determined *418 against petitioners for the years at issue derive almost entirely from petitioners' failure to report the embezzled funds. OPINION In the case of a joint return, the liability of the spouses with respect to the tax generally is joint and several. Sec. 6013(d)(3). Section 6013(e), however, creates an exception to that rule, providing a measure of relief where the taxpayer proves herself to be an "innocent spouse" by satisfying the following four requirements: (1) A joint return has been made for the taxable year at issue; (2) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse; (3) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, of such substantial understatement; and (4) it would be inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement. Sec. 6013(e)(1). Petitioner bears the burden of proving that she is entitled to relief as an innocent spouse under section 6013(e). Rule 142(a). Respondent concedes that the first two requirements are satisfied and, thus, we need only consider *419 whether the third and fourth are satisfied as well. I. 1983
With respect to 1983, we find for respondent, because petitioner has failed to demonstrate that she neither knew, nor had reason to know, about the substantial understatement at the time petitioners' return was signed. See sec. 6013(e)(1)(C). Albert was sued and indicted for embezzlement in January 1984, several months prior to the signing of the 1983 return, in April 1984. Furthermore, both Albert and petitioner testified that he told her about the embezzlement in January 1984. Last, petitioner concedes on brief that "Ruth Ferrarese first became aware of the embezzlement in January, 1984." Nonetheless, petitioner contends that she had no reason to know of the understatement. In support of that contention, petitioner cites Anderson v. Commissioner, T.C. Memo. 1975-104. In Anderson, we found incredible the testimony of the taxpayer wife who asserted that, after her husband's conviction for embezzlement, she still relied upon his assurance that, although he had taken the money, he had not embezzled -- because all of that money had been used to benefit his employer's business. *420 In so finding, we suggested that we might have believed that she so relied after the indictment but before the conviction. Anderson is insufficient to carry the day for petitioner, however, because nothing in the record suggests that similar assurances were made by Albert to petitioner. [1] Thus, petitioner cannot reasonably have believed Albert innocent of embezzlement. Accordingly, we find that petitioner knew or had reason to know of the embezzlement in January 1984 (before the 1983 return was signed) and therefore knew or had reason to know of the understatement for 1983. Petitioner does not qualify as an innocent spouse for 1983. *421 II. 1981 And 1982
A. Knowledge or Reason To Know
We find that, as to 1981 and 1982, petitioner neither knew nor had reason to know of the substantial understatement because she neither knew nor had reason to know of the embezzled funds. [2] *422 Overall, the record demonstrates that, prior to January 1984, Albert made every attempt to keep his embezzlement a secret from petitioner. First, both petitioner and Albert testified that Albert did not tell her about the embezzlement prior to January 1984. [3] Second, the testimony of Albert's cousin, Father Fernando Ferrarese (Fernando), corroborates their testimony. Fernando testified that, when Albert gave him money to help his (Fernando's) father, Albert insisted that he not tell petitioner. Although Fernando did not testify as to why Albert made that request, we infer that he did so because he did not wish petitioner to become suspicious and learn about the embezzled funds. Accordingly, we believe that Albert did not tell petitioner about the embezzled funds prior to January 1984, subsequent to the signing of the 1981 and 1982 returns. Thus, we must consider whether, notwithstanding Albert's efforts to deceive petitioner, sufficient clues existed as would have given her knowledge, or reason to know, of the embezzled funds. We conclude that sufficient clues did not exist. Preliminarily, we observe that Albert deposited all of the embezzled funds in a bank account under the name William Morris. Given our conclusion that Albert did not tell petitioner about that account, we do not believe she could have known such account contained substantial *423 funds of dubious origin, as she might if such funds were placed in, for example, a joint account of Albert and petitioner's. Similarly, we think that Albert successfully concealed from petitioner the gifts to his uncle, his sister (who lived in Italy), and other family members. Fernando's testimony demonstrates that Albert at least tried to conceal from petitioner the gifts to his uncle. We believe that Albert made similar efforts to conceal the other gifts and that such efforts were successful. Accordingly, we think that petitioner can only have known, or had reason to know, of the embezzled funds if petitioners' standard of living or expenditures were so great as to suggest some irregularity in their finances. We do not think that petitioners' standard of living or expenditures reached that level. With respect to the substantial number of tickets Albert procured for business purposes, petitioner testified that she believed such tickets were obtained through Benton & Bowles, rather than petitioners' personal funds. We accept that petitioner believed that her husband, a vice president, did not pay for such tickets out of their personal funds. With respect to those tickets *424 to sports events and a play obtained by Albert for petitioner and their sons, we consider such expenditures insufficient to suggest an irregularity in the family's finances. We think the same applies to the company functions, the yearly trips to Las Vegas, and petitioner's clothing and jewelry, given Albert's position as a vice president of Benton & Bowles. With respect to the Frank Sinatra concert, the record does not indicate that petitioner knew those tickets cost $ 1,000 apiece. Robert F. Lyman, to whom Albert reported at Benton & Bowles, attended that concert and testified that he did not know the tickets cost that much until after the affair. Given that petitioner may well have failed to realize how expensive those tickets were, we do not believe that concert should have prompted her to investigate the family's finances and discover the embezzled funds Albert placed into a separate account under an assumed name. We find that petitioner neither knew nor had reason to know of the embezzled funds, or of the understatements, in 1981 or 1982. B. Equity of Joint Liability
The other innocent-spouse requirement at issue is whether it would be inequitable to hold petitioner *425 liable for the deficiencies at issue. Sec. 6013(e)(1)(D). In making that determination, we must consider whether petitioner significantly benefited from the embezzled funds omitted from gross income. Sec. 1.6013-5(b), Income Tax Regs. We find that she did not. The record demonstrates that substantial portions of the embezzled funds benefited persons other than petitioner: specifically, Benton & Bowles' clients and executives, as well as family members other than petitioner (including Albert's uncle and sister), appear to have reaped the lion's share of the benefits flowing from the embezzled funds. Generally, the record suggests that Albert and petitioner's lifestyle was neither unusual nor lavish, given Albert's position as a vice president of Benton & Bowles. Just as the expenditures connected with their lifestyle were insufficient to suggest that petitioner should have known about the embezzled funds, those expenditures were insufficient to suggest that petitioner received a significant benefit therefrom. See sec. 1.6013-5(b), Income Tax Regs.
Nevertheless, respondent argues as follows: The equity in holding Mrs. Ferrarese liable for the tax is clear. Petitioners have *426 arranged their affairs in such a manner that Mrs. Ferrarese and her sister-in-law own all assets derived from Mr. Ferrarese. Any assets that derive from the marriage derived from Albert Ferrarese. Any assets now held in the still intact marriage are those derived from Albert Ferrarese. The object of petitioners' claim is nominally relief of Ruth Ferrarese's liability. However, in reality it is the relief of Albert Ferrarese that is being sought. * * * Should the Court grant her the relief sought, after their deliberate arrangement of their affairs to shift assets to Ruth Ferrarese, the result would be inequitable. * * *
Significantly, respondent does not argue that the assets owned solely by petitioner are traceable to the embezzled funds. Rather, respondent appears to argue that the transfer of such assets to petitioner was improper because such assets otherwise might have been available to satisfy Albert's tax liability. That type of transfer, however, does not constitute a benefit (much less one that is significant) within the meaning of section 6013(e)(1)(D). Section 1.6013-5(b), Income Tax Regs., provides guidance as to what type of transfer constitutes a benefit: *427 "Thus, for example, if a person seeking relief receives from his spouse an inheritance of property or life insurance proceeds which are traceable to items omitted from gross income by his spouse, that person will be considered to have benefited from those items." (Emphasis added.) Although the above example is nonexclusive, it clearly implies that a transfer of property not traceable to items omitted from gross income by the culpable spouse does not constitute a benefit. Accordingly, we find that petitioner (whose property is not so traceable) received no significant benefit. It therefore would be inequitable to hold petitioner liable for the deficiencies as to 1981 and 1982. See id. We hold that, as to 1981 and 1982, petitioner is an innocent spouse within the meaning of section 6013(e). [4]
*428 Decision will be entered under Rule 155.
Footnotes
1. 50 percent of the interest due on the deficiency.↩
1. Albert's and petitioner's testimony, to the extent it is on point, suggests the opposite. Regarding his indictment in January 1984, Albert testified as follows: Q: Did your wife know about that at the time? A: She didn't know why I -- she didn't know I was being indicted. When I saw Ron Klienberg [Albert's attorney], when I finally got to his office, the first thing he asked me was, "Did you tell your wife? Does your wife know what happened?" I said no. He said, "Before I represent you, I want you to tell your wife the truth -- everything you did." Q: Did you tell her? A: I told her. THE COURT: This was when? THE WITNESS: January of '84. THE COURT: So January of '84 you told her everything? THE WITNESS: Yes, sir. THE COURT: Okay. Petitioner testified as follows: THE COURT: Why don't we do it this way, when did you first learn that your husband was embezzling funds from Benton and Bowles? THE WITNESS: When he came home and was fired. THE COURT: Is that sufficient, Mr. LaBelle? MR. LABELLE: That is sufficient. Thank you.↩
2. But for the failure to report the embezzled funds, the understatements for the years at issue would be minimal. Accordingly, the parties appear to accept, and we agree, that, if petitioner had no reason to know about the embezzled funds, she had no reason to know that there was a substantial understatement of income for any year at issue.↩
3. Respondent urges us to discount petitioners' testimony as incredible, on the grounds that (1) Albert is a proven liar and convicted embezzler, and (2) petitioner understated her knowledge of financial matters and made certain statements in her affidavit that were inconsistent with her testimony at trial. We understand and, to a degree, share respondent's concerns. Nevertheless, we think it significant that petitioners' testimony is buttressed by other evidence in the record and is damaging to petitioner's innocent-spouse case as to 1983. We will accord some weight to petitioners' testimony.↩
4. The absence of joint liability under these circumstances does not render the Commissioner unable to deal with a fraudulent-transfer scheme. Where a taxpayer transfers property in fraud of the Commissioner, the Commissioner may be able to collect some or all of the tax from the transferee pursuant to sec. 6901, or bring an action to set aside the transfer.↩