# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

No. 96-60393

_____

REBECCA JO RESER,

                              Petitioner-Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

                              Respondent-Appellee.

_____

Appeal from the United States Tax Court

_____

May 12, 1997

Before JOLLY, JONES and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Petitioner-Appellant Rebecca Jo Reser (Reser) appeals the Tax Court's decision disallowing certain deductions that she and her former husband, Don C. Reser (Don), claimed on their 1987 and 1988 joint income tax returns. The deductions represented losses incurred by Don's subchapter S corporation for those years. Reser asserts, in the alternative, that she is not liable for any deficiency determined by the Tax Court on the 1987 joint

return, as she is an innocent spouse, as defined in 26 U.S.C. §6013(e). Although we affirm the Tax Court's disallowance of the questioned deductions, we conclude that Reser is entitled to innocent spouse relief for the 1987 joint return. We therefore reverse the judgment of the Tax Court insofar as it holds her liable for any deficiency in tax, including interest, penalties, or other amounts, attributable to the substantial understatement of tax on that return. In addition, we hold, for essentially the same reasons, that she is not liable for negligence and substantial understatement penalties attributable to the deficiency on the 1988 joint return.

## I.

### FACTS AND PROCEEDINGS

Reser is a personal injury defense lawyer who obtained an undergraduate degree in history from Stanford University and a law degree from the University of Texas. Don has an undergraduate degree in economics from Stanford University, a law degree from the University of Houston, and a Masters in Business Administration from the University of Texas. The Resers were married from

2

1974 until 1991 when they divorced.

In 1984, Don created a professional corporation, Don C. Reser, P.C. (DRPC), to broker large real estate projects. He made an initial capital contribution of $6,000 and named himself the sole shareholder.[1] That same year, DRPC elected to be taxed under subchapter S of the Internal Revenue Code (the Code).[2]

During the years in question, DRPC's main business activity was the offering for sale of Central Park Mall, a large shopping center in San Antonio, Texas. As a new corporation, DRPC needed operating capital, so Don and DRPC together obtained a line of credit from North Frost Bank of San Antonio, Texas (Frost Bank). The line of credit was documented by fourteen promissory notes executed jointly by Don and DRPC in favor of Frost Bank. The notes were dated from 1985 to 1989, and each was payable ninety days after its execution. The final note stated a cumulative principal loan balance of

---

[1]The Resers were subject to Texas' community property regime, which classifies DRPC as their community property. See Tex. Fam. Code §5.01 et seq. (West 1993). Pursuant to these rules, Reser is considered to be the one-half owner of DRPC even though Don is the only registered shareholder.

[2]See 26 U.S.C. §1362 (1994).

$467,508.54. Don and DRPC were jointly and severally liable to Frost Bank for repayment, but the loan was not collateralized with any property belonging to Don or DRPC.

Whenever DRPC needed to draw on the line of credit, Don would call Frost Bank and request that funds be deposited directly into DRPC's account.[3] Don had total discretion with respect to these funds, and he used them for DRPC's operating capital as well as for personal expenses. When Don needed funds for his personal use, he withdrew them from DRPC's account.

In 1986, Don and DRPC executed a guaranty agreement with an individual, Don Test, pursuant to which Test guaranteed the Frost Bank line of credit and provided collateral (shares of stock in Genuine Auto Parts Company) for the loan. In exchange, Don agreed to pay Test a fee of $14,998.50 for each ninety day period that his guaranty was outstanding. DRPC's ledgers for 1987 and 1988 together reflected approximately $82,000 in guaranty fee payments made to Test. In 1989, Test paid the balance of the notes to Frost Bank.

---

[3]Don customarily spoke to the secretary for the senior vice president who approved the line of credit.

For each tax year of its corporate existence, DRPC filed a Form 1120S, the federal tax return for an S corporation. DRPC reported $257,354 in losses for 1987 and $333,581 in losses for 1988. None dispute that DRPC actually incurred these losses.

For the 1987 and 1988 tax years, the Resers filed joint income tax returns on which they claimed as deductions the losses that DRPC had reported. The IRS conducted an audit of those returns, questioning specifically the deductibility of DRPC's losses. IRS Agent Kesha Lange attempted to ascertain Don's adjusted basis in DRPC, which, in turn, would determine any limitation on the Resers' deductibility of DRPC's losses. Don provided Lange with the promissory notes executed in favor of Frost Bank, the guaranty agreement with Test, and DRPC's ledgers. Lange determined that (1) the Frost Bank loan was made to DRPC, (2) Don could not increase his basis in DRPC by the amount of the loan proceeds, and (3) Don had insufficient basis in DRPC to deduct the losses.

When Lange informed Don of her conclusions, he asserted for the first time that Frost Bank had loaned

5

the money to him individually and that he, in turn, had loaned the money to DRPC. Despite Don's assertions, he provided no documentation in support of the purported arrangement. DRPC's corporate tax returns did not indicate any indebtedness from DRPC to Don in amounts corresponding to the Frost Bank loan proceeds, and its ledgers did not reflect any payments of principal or interest to Don during 1987 or 1988.[4] Neither was there any evidence that Don had made any principal or interest repayments to Frost Bank on the loan personally.

In 1991, the IRS issued a notice of deficiency, disallowing all of the deductions that the Resers had claimed as DRPC's losses on their 1987 and 1988 joint returns.[5] Curiously, after the IRS issued the notice of deficiency, Don produced copies of a series of promissory notes, allegedly executed by him on behalf of DRPC and purporting to reflect DRPC's indebtedness to him in the amount of the Frost Bank loan.

The Resers filed a petition in the United States Tax

---

[4]DRPC's ledgers for 1987 and 1988 reflected one principal payment and five interest payments to Frost Bank.

[5]The Commissioner later allowed $36,855 of the loss deduction for 1987.

6

Court seeking a redetermination of the deficiencies assessed by the Commissioner. Reser asserted, in the alternative, that she was an innocent spouse for purposes of the 1987 joint return, as defined in 26 U.S.C. §6013(e), and was not liable for any deficiency determined by the Tax Court.[6]

The Tax Court (1) concluded that Don did not have sufficient basis in DRPC to claim its losses as deductions on the 1987 and 1988 joint returns, (2) assessed penalties for negligence, substantial understatements of tax, and failure to file timely, and (3) denied Reser's alternative request for innocent spouse relief.[7]

Reser alone appealed,[8] asserting that the Tax Court

_____

[6]Prior to trial, the parties entered into a stipulation of facts which contained certain computations relating to Don's basis in DRPC. The computations were made by IRS Agent Judith A. Lopez who, in auditing the Resers' 1989 and 1990 joint income tax returns, determined that Don's basis in DRPC was greater than that determined by Lange in her audit of the 1987 and 1988 joint tax returns.

[7]The Tax Court concluded also that Don was not liable for any self-employment tax on a $15,000 payment that Reser had received in 1987 as a referral fee.

[8]In June 1996, Don filed a notice of appeal, which we dismissed in August 1996 for lack of prosecution.

erred in (1) disallowing the deductions, (2) holding her liable for negligence and substantial understatement penalties,[9] and (3) denying her innocent spouse relief on the 1987 joint return.

## II.

## ANALYSIS

A. The Innocent Spouse Defense

We address first whether Reser qualifies for relief as an innocent spouse for purposes of the 1987 joint return, recognizing that a ruling in her favor relieves her of all liability attributable to the substantial understatement of tax on that return[10] and pretermits our determination of the other alleged errors concerning that return. Reser concedes that, for technical reasons, she is not eligible for innocent spouse relief from the

---

[9]Reser maintains also that the Tax Court erroneously calculated the 1987 negligence penalty. She did not appeal the penalty for failure to file timely.

[10]See 26 U.S.C. §6013(e)(1)(flush language)(1994). The phrase "flush language" is a fairly well-understood term of statutory construction which is used to refer to language that is written from margin to margin and that applies to an entire statutory section as opposed to language that is indented to designate applicability limited to a particular subsection or sub-subsection.

deficiency on the 1988 joint return.[11]

## 1. Standard of review

We review the Tax Court's determination that a spouse is not entitled to relief as an innocent spouse under the clearly erroneous standard.[12]

## 2. Applicable law

The Code permits married persons to make "a single return jointly of income taxes."[13] Spouses who file a joint return are generally liable jointly and severally for the tax due on their aggregate income, including interest and penalties.[14] Congress, however, has statutorily mitigated the harshness of this rule by enacting the innocent spouse defense. Accordingly, a taxpayer who qualifies as an innocent spouse is relieved of liability for the tax, including interest, penalties, and other amounts, attributable to a deficiency on the

---

[11]For the 1988 joint return, Reser failed to meet the requirement that the liability be greater than 25% of the adjusted gross income for the preadjustment year. See 26 U.S.C. §6013(e)(4)(B)(1994).

[12]Park v. Commissioner, 25 F.3d 1289, 1291 (5th Cir.), cert. denied, -- U.S.--, 115 S. Ct. 673 (1994).

[13]26 U.S.C. §6013(a)(1994).

[14]26 U.S.C. §6013(d)(3)(1994); Park, 25 F.3d at 1292.

joint return.[15]

To assert the innocent spouse defense successfully, a spouse must establish that (1) a joint return was made for the taxable year; (2) on that return there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) in signing the return, the spouse did not know, and had no reason to know, of such substantial understatement; and, (4) taking into account all the facts and circumstances, it would be inequitable to hold the spouse liable for the deficiency.[16] The burden of proof lies with the spouse seeking relief.[17] Stated differently, a spouse's failure to prove any one of the statutory elements precludes relief.

In the instant case, the parties stipulated to the Tax Court that the Resers filed a joint return for the 1987 tax year on which there is a substantial understatement of tax. At issue, however, are whether

---

[15]26 U.S.C. §6013(e)(1)(flush language)(1994).

[16]26 U.S.C. §6013(e)(1)(1994); See also Park, 25 F.3d at 1292; Buchine, 20 F.3d at 180.

[17]Park, 25 F.3d at 1292; Bokum v. Commissioner, 94 T.C. 126, 138 (1990), aff'd on other grounds, 992 F.2d 1132 (11th Cir. 1993).

10

(1) the substantial understatement is attributable to grossly erroneous items, (2) Reser knew or had reason to know of the substantial understatement, and (3) it would be inequitable to hold Reser liable.[18]  We shall consider each contested element *seriatim*.

*3. Grossly erroneous item*

Reser must establish first that the substantial understatement of tax on the 1987 joint return is attributable to grossly erroneous items.[19]  The Code defines grossly erroneous items, with respect to any spouse, as:

> (A) any item of gross income attributable to such spouse which is omitted from gross income, and
> (B) <u>any claim of a deduction, credit, or basis by such spouse in an amount for which there is</u>

---

[18]The grossly erroneous items must be attributable to the <u>other</u> spouse.  <u>See</u> 26 U.S.C. §6013(e)(1)(B)(1994). As the Commissioner does not contest that the grossly erroneous items were Don's, we will assume that this is not an issue.

[19]The Tax Court did not address whether the substantial understatement of tax was attributable to grossly erroneous items, and Reser's appellate brief makes no specific argument on this point.  Reser's assertion of the innocent spouse defense in the inconsistent alternative, however, necessarily assumes a ruling disallowing the Resers' deductions of DRPC's losses, thereby establishing this element of the defense.

<u>no basis in fact or law</u>.[20]

There is no question that the substantial understatement is attributable to <u>deductions</u> claimed on the joint return and not to omissions of income. Thus the relevant inquiry is whether those deductions have "no basis in fact or law." The Code does not define the phrase, "no basis in fact or law," but the Tax Court has stated that:

> a deduction has no basis in fact when the expense for which the deduction is claimed was never, in fact, made. A deduction has no basis in law when the expense, even if made, does not qualify as a deductible expense under well-settled legal principles or when no substantial legal argument can be made to support its deductibility. Ordinarily, a deduction having no basis in fact or in law can be described as frivolous, fraudulent, or ... phony.[21]

The deductions clearly have a basis in fact, as it is undisputed that DRPC actually incurred the losses, that DRPC is an S corporation, and that Don owned all issued and outstanding stock in DRPC. Thus Reser must show that

_____

[20]26 U.S.C. §6013(e)(2)(1994) (emphasis added).

[21]<u>Bokum</u>, 94 T.C. at 142 (quoting <u>Belk v. Commissioner</u>, 93 T.C. 434, 442 (1989)); <u>Douglas v. Commissioner</u>, 86 T.C. 758, 762-63 (1986); <u>Purcell v. Commissioner</u>, 826 F.2d 470, 475-76 (6th Cir. 1983), <u>cert. denied</u>, 485 U.S. 987, 108 S. Ct. 1290 (1988).

the deductions have no basis in law.[22]

### a. Applicable law

The income of a corporation that has made a subchapter S election is not subject to the corporate income tax; rather, it is taxed pro rata to its shareholders — a method commonly known as flow-through taxation.[23] Similarly, any net operating loss incurred by an S corporation passes through to its shareholders, each of whom may deduct from his personal gross income his pro rata share of the corporation's loss.[24] There are, however, statutory limitations on the deductibility of losses at the shareholder level. Section 1366(d) of the Code provides in pertinent part:

> The aggregate amount of losses and deductions taken into account by a shareholder ... for any taxable year shall not exceed the sum of
>     (A) the adjusted basis of the shareholder's stock in the S corporation ..., and
>     (B) the shareholder's adjusted basis of any indebtedness of the S corporation to the

---

[22]See Bokum, 94 T.C. at 144 (finding grossly erroneous items where there was no basis in law for the deductions).

[23]26 U.S.C. §1366(a)(1994); Underwood v. Commissioner, 535 F.2d 309, 310 (5th Cir. 1976).

[24]26 U.S.C. §1366(a)(1994); Underwood, 535 F.2d at 310.

shareholder.[25]

It is well established that a shareholder cannot increase his basis in his S corporation stock without making a corresponding economic outlay.[26] Furthermore, courts have consistently held that when a shareholder personally guarantees a debt of his S corporation, he may not increase his adjusted basis in the corporation's indebtedness to him unless he makes an economic outlay by satisfying at least a portion of the guaranteed debt.[27]

### b. No basis in law

In the instant case, Don argued to the Tax Court that

---

[25]26 U.S.C. §1366(d)(1994).

[26]Harris v. United States, 902 F.2d 439, 443 (5th Cir. 1990); Underwood, 535 F.2d at 311-12; Leavitt v. Commissioner, 875 F.2d 420, 422 (4th Cir.), aff'g, 90 T.C. 206 (1988), cert. denied, 493 U.S. 958, 110 S. Ct. 376 (1989); Selfe v. United States, 778 F.2d 769, 772 (11th Cir. 1985).

[27]See e.g. Underwood, 535 F.2d at 312; Harris, 902 F.2d at 445; Leavitt, 875 F.2d at 422; Brown v. Commissioner, 706 F.2d 755, 756 (6th Cir. 1983); Uri v. Commissioner, 949 F.2d 371 (10th Cir. 1991); Roesch v. Commissioner, 57 T.C.M. (CCH) 64, 65 (1989), aff'd, 911 F.2d 724 (4th Cir. 1990). But see Selfe, 778 F.2d at 772-75 (shareholder's guarantee is sufficient to increase basis in S corporation if the facts demonstrate that, in substance, shareholder borrowed funds and subsequently advanced them to corporation; remanding to Tax Court to determine whether loan from bank to S corporation was in reality a loan to shareholder). We are not bound by the Eleventh Circuit's decision.

he had made the requisite economic outlay to increase his basis in DRPC by the amount of the Frost Bank loan proceeds. Specifically, he contended that Frost Bank loaned the money to him individually and that he, in turn, loaned the money to DRPC. As evidence of the purported arrangement, Don produced copies of a series of promissory notes payable to him by DRPC. Rejecting Don's argument and implicitly discrediting the notes, the Tax Court found that (1) there was no evidence of a legitimate debt between Don and DRPC, (2) Don could not increase his basis in DRPC by the amount of the Frost Bank loan proceeds, and (3) Don had insufficient basis in DRPC to claim its losses as deductions on the joint returns. We review the factual findings of the Tax Court for clear error.[28]

We agree with the Tax Court's conclusion that there was no legitimate debt between DRPC and Don corresponding to the amount of the Frost Bank loan proceeds. First, the promissory notes payable to Frost Bank were executed by Don and DRPC together, indicating on their face that

---

[28]Park v. Commissioner, 25 F.3d 1289, 1291 (5th Cir. 1994); McKnight v. Commissioner, 7 F.3d 447, 450 (5th Cir. 1993).

15

Frost Bank did not lend the money to Don alone.[29]  Second, Frost Bank always deposited the loan proceeds directly into DRPC's account.  Third, Don, individually, did not make any repayments on the loan to Frost Bank, but DRPC made both principal and interest payments to Frost Bank. Finally, DRPC's corporate tax returns reflected the notes as payable to Frost Bank, not to Don, even though the returns listed other notes payable to Don.

The only evidence of a debt between Don and DRPC was a series of promissory notes, purporting to represent indebtedness from DRPC to Don, which Don produced after the IRS issued its notice of deficiency.  The delayed appearance of these notes caused the Tax Court to question their authenticity; and we find no clear error in the court's decision to disregard them entirely. Neither DRPC's 1987 nor 1988 corporate return reflected the alleged indebtedness to Don.  Furthermore, there is no evidence that (1) Don ever received or that DRPC ever paid any interest or principal on these notes or (2) DRPC made any "loan" repayments to Don.

---

[29]None dispute that Frost Bank would not have made a loan to DRPC without a guaranty from Don or another guarantor, as neither Don nor DRPC provided the bank with collateral, and DRPC had no assets.

We find that the parties' treatment of the Frost Bank loan, from the time it was entered into until the IRS issued its notice of deficiency, was wholly consistent with the unambiguous, credible documentation of the transaction and entirely inconsistent with the way in which Don attempted post hoc to recast the transaction to the Tax Court. Again, the only evidence to the contrary is a series of promissory notes to which the Tax Court attributed no probative value. As structured and otherwise documented, the transaction did not lack adequate reality or substance. Regrettably for Don, taxpayers are bound by the form that they have chosen for the transaction and may not in hindsight recast the transaction as one that they might have made to obtain tax advantages.[30] We therefore conclude that Don may not

---

[30]Harris, 902 F.2d at 443 (citing Don E. Williams Co. v. Commissioner, 429 U.S. 569, 97 S. Ct. 856-57 (1977); Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149, 94 S. Ct. 2129, 2137 (1974)). In some circumstances, however, the IRS may disregard form and recharacterize a transaction by looking to its substance. Harris, 902 F.2d at 443 (citing Higgins v. Smith, 308 U.S. 473, 60 S. Ct. 355 (1940)). See also Uri v. Commissioner, 949 F.2d 371, 373 n.4 (10th Cir. 1991). For example, in Blum v. Commissioner, 59 T.C. 436, 440 (1972), the Tax Court recognized an exception that permits a shareholder to question a transaction's form when he argues that his guaranty of a corporate debt should be recast as an equity investment on his part.

increase his basis in DRPC by the amount of the Frost Bank loan proceeds; consequently, the Resers are not entitled to deduct DRPC's losses on their 1987 and 1988 joint returns.

More pertinent to Reser, however, is the favorable impact of this ruling on the innocent spouse issue. As we have disallowed the deductions, the conclusion is inescapable that the substantial understatement of tax on the 1987 joint return is attributable to grossly erroneous items.

4. *Know or reason to know*

a. Background

Reser must prove next that, in signing the 1987 joint

---

The Tax Court later clarified its decision, however, noting that the Blum court never reached the debt/equity issue because the taxpayer failed to carry his burden of proving that the loan, in substance, was made to him and not to the corporation. Leavitt v. Commissioner, 90 T.C. 206, 215 (1988). In affirming the Tax Court, the Fourth Circuit stated that the Code's provisions limiting the basis of a subchapter S shareholder to his corporate investment or outlay could not be circumvented through the use of debt/equity principles. Leavitt v. Commissioner, 875 F.2d 420 (4th Cir.), cert. denied, 493 U.S. 958, 110 S. Ct. 376 (1989). In the instant case, in which Don failed to prove that the bank, in substance, loaned the money to him and not to DRPC, we will not look behind the form and structure of the transaction in an attempt to recharacterize it as an economic outlay. See Harris, 902 F.2d at 443.

return, she did not know, and had no reason to know, of the substantial understatement of tax.[31]

Courts have generally agreed that when the substantial understatement of tax liability is attributable to an <u>omission of income</u> from the joint return, the relevant inquiry is whether the spouse seeking relief knew or should have known of an income-producing <u>transaction</u> that the other spouse failed to report.[32]  In short, in omission of income cases, the spouse's knowledge of the underlying transaction which produced the omitted income is alone sufficient to preclude innocent spouse relief.

When the substantial understatement is traceable to <u>erroneous deductions</u>, however, the Tax Court is in disagreement with some of the circuits as to whether the "knowledge of the transaction" test is appropriate. Although we have not addressed this issue in the past, at

_____

[31]26 U.S.C. §6013(e)(1)(C)(1994).

[32]<u>Park v. Commissioner</u>, 25 F.3d 1289, 1294 (5th Cir.), <u>cert. denied</u>, -- U.S.--, 115 S. Ct. 673 (1994); <u>Sanders v. United States</u>, 509 F.2d 162, 169 (5th Cir. 1975);  <u>Hayman v. Commissioner</u>, 992 F.2d 1256, 1261 (2d Cir. 1993); <u>Erdahl v. Commissioner</u>, 930 F.2d 585, 589 (5th Cir. 1991); <u>Guth v. Commissioner</u>, 897 F.2d 441, 444 (9th Cir. 1990); <u>Quinn v. Commissioner</u>, 524 F.2d 617, 626 (7th Cir. 1975).

least four circuits have expressly rejected application of the knowledge-of-the-<u>transaction</u> test in erroneous deductions cases. They have concluded instead that the proper inquiry is whether the spouse seeking relief knew or had reason to know that the <u>deduction</u> would give rise to a substantial understatement.[33] The leading case in this camp is the Ninth Circuit's decision in <u>Price v. Commissioner</u>.[34] The Tax Court, however, in <u>Bokum v. Commissioner</u>,[35] explicitly refused to acquiesce in <u>Price</u> and continues to apply the knowledge-of-the-transaction test in omission of income cases and erroneous deduction cases alike.[36] In <u>Bokum</u>, the Tax Court found support for

---

[33]<u>See</u> <u>Bliss v. Commissioner</u>, 59 F.3d 374, 378 n.1 (2d Cir. 1995); <u>Hayman v. Commissioner</u>, 992 F.2d 1256, 1261 (2d Cir. 1993); <u>Friedman v. Commissioner</u>, 53 F.3d 523, 530 (2d Cir. 1995); <u>Resser v. Commissioner</u>, 74 F.3d 1528, 1535-36 (7th Cir. 1996); <u>Erdhal v. Commissioner</u>, 930 F.2d 585, 589 (8th Cir. 1991); <u>See also Kistner v. Commissioner</u>, 18 F.3d 1521, 1527 (11th Cir. 1994)(citing <u>Price</u> and <u>Erdhal</u> with approval).

[34]887 F.2d 959 (9th Cir. 1989).

[35]94 T.C. 126 (1990), <u>aff'd on other grounds</u>, 992 F.2d 1132 (11th Cir. 1993).

[36]The Tax Court recently adhered to its position in <u>Bellour v. Commissioner</u>, 69 T.C.M. (CCH) 3010 (1995) (denying innocent spouse relief to a wife who knew of the transaction for which a grossly erroneous tax deduction was taken on her joint return but not of the tax consequences of that transaction). The Tax Court

its position in the Sixth and Seventh Circuits.[37]

Significantly, however, since the Tax Court's decision in Bokum, the Seventh Circuit has changed its position and followed Price,[38] and the Sixth Circuit has not had the opportunity to revisit the issue.

In rejecting the knowledge-of-the-transaction test in erroneous deduction cases, the Price court was careful not to discount entirely a spouse's knowledge of the underlying transaction.  That court stated,

> we do not mean to say that a spouse's knowledge
> of the transaction underlying the deduction is
> irrelevant.  Obviously, the more a spouse knows
> about a transaction, *ceteris paribus*, the more
> likely it is that she will know or have reason
> to know that the deduction arising from the

---

acknowledges, however, that it will follow Price in cases appealable to the Ninth Circuit.  See Bokum, 94 T.C. at 151 (citing Golsen v. Commissioner, 54 T.C. 742, 756-57 (1970), aff'd, 445 F.2d 985 (10th Cir.), cert. denied, 404 U.S. 940, 92 S. Ct. 284 (1971)).  Presumably, the Golsen rule applies to Tax Court cases appealable to the other circuits that have followed Price.

[37]"As the Seventh Circuit stated: '[t]he knowledge contemplated by [section 6013(e)] is not knowledge of the tax consequences of a transaction but rather knowledge of the transaction itself.'"  Bokum, 94 T.C. at 152-53 (quoting Purcell v. Commissioner, 826 F.2d 470, 474 (6th Cir. 1987), cert. denied, 485 U.S. 987, 108 S. Ct. 1290 (1988)(quoting Quinn v. Commissioner, 524 F.2d 617, 626 (7th Cir. 1975))).

[38]See Resser v. Commissioner, 74 F.3d 1528 (7th Cir. 1996).

transaction may not be valid.  We merely conclude that standing by itself, such knowledge does not preclude relief.[39]

In addition, the court enumerated several factors to consider in determining whether a spouse had reason to know of the substantial understatement.[40]

### b. Applicable standard in this circuit

The Price and Bokum approaches intersected for the first time in this circuit in Park v. Commissioner,[41] an erroneous deduction case in which the taxpayer argued that her knowledge of the underlying transactions did not give her reason to know of the erroneous deductions so as to destroy the availability of innocent spouse relief.

---

[39]Price, 887 F.2d at 963 n.9.

[40]These include (1) the spouse's level of education, (2) the spouse's involvement in the family's business and financial affairs, (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances.
Id. at 965 (citing Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989)).

[41]25 F.3d 1289 (5th Cir.), cert. denied, -- U.S. --, 115 S. Ct. 673 (1994).  In Park, we did not address whether the two approaches actually espoused different principles.  Id. at 1299 n.3.  See also Price, 887 F.2d at 963 n.9, n.10 (noting the functional similarity between the two tests).  Again we leave that question for another day.

22

Declining to rule specifically on the applicable standard in this circuit, we concluded that the taxpayer had reason to know of the substantial understatement under either approach.[42]   But we recognized, and the Tax Court agrees, that the general standard of inquiry concerning a spouse's reason to know in both omission of income and erroneous deduction cases is whether a reasonably prudent taxpayer in the spouse's position at the time she signed the return could be expected to know that the stated liability was erroneous or that further investigation was warranted.[43]

The facts before us today present the issue, and we neither can nor care to duck it: We must decide whether to join the growing number of circuits that have adopted the Price approach or to follow the Tax Court.  But we do not find this choice problematical — we conclude that the Price approach is clearly the better.  Thus we hold that the proper test of a spouse's knowledge in an erroneous deduction case is whether the spouse seeking

---

[42]Park, 25 F.3d at 1298.

[43]Park, 25 F.3d at 1298 (citing Sanders v. Commissioner, 509 F.2d 162, 167 (5th Cir. 1975)).  See also Price, 887 F.2d at 965 and Bokum, 94 T.C. at 148.

relief knew or had reason to know that the deduction in question would give rise to a substantial understatement of tax on the joint return.  We hasten to add, lest there be doubt, that our decision today does not disturb the unquestioned application of the knowledge-of-the-transaction test in omission and understatement of income cases.

If we had chosen instead to apply the knowledge-of-the-transaction test in erroneous deduction cases, we would have made it virtually impossible for a spouse ever to obtain innocent spouse relief in such cases.  As the Price court noted, deductions are conspicuously recorded on the face of the tax return; therefore, any spouse who, at a minimum, reads the return will be put on notice that some transaction gave rise to the deduction. Furthermore, in the 1980's, it was common knowledge that investors could legally obtain large tax benefits through clever investment strategies.[44]  Thus mere knowledge that a spouse had invested in a tax shelter would establish constructive knowledge of a substantial understatement. Such a result would undermine the objective of the

---

[44]Friedman v. Commissioner, 53 F.3d 523, 531 (2d Cir. 1995).

innocent spouse defense, which is intended to provide relief in both erroneous deduction and omission of income cases.[45]

In determining a spouse's reason to know under our newly adopted standard, the relevant factors to consider include: (1) the spouse's level of education; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances.[46]

Nevertheless, when the spouse seeking relief knows sufficient facts such that a reasonably prudent taxpayer in his position would be led to question the legitimacy

---

[45]When the innocent spouse defense was enacted initially, it provided relief from substantial understatements attributable to omissions of income only. In 1984, however, Congress expanded the protection of the innocent spouse defense, expressly making relief available for erroneously claimed deductions and credits also. See Park, 25 F.3d 1289, 1292 (1994).

[46]See Price, 887 F.2d at 965; Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989); Erdahl v. Commissioner, 930 F.2d 585, 590-91 (8th Cir. 1991); Friedman, 53 F.3d at 531; Resser v. Commissioner, 74 F.3d 1528, 1536 (7th Cir. 1996); Bliss v. Commissioner, 59 F.3d 374, 378 (2d Cir. 1995).

of the deductions, he has a duty to make further inquiry. Tax returns setting forth "dramatic deductions" will generally put a reasonable taxpayer on notice that further investigation is warranted.[47]  A spouse who has a duty to inquire but fails to do so may be charged with constructive knowledge of the substantial understatement and thus precluded from obtaining innocent spouse relief.

### c. Did Reser have reason to know?

The Tax Court denied Reser's claim for innocent spouse relief on the sole ground that she had either reason to know that the stated liability was erroneous or a duty to make further investigation.  When we consider Reser's actual knowledge and the four relevant factors, we are convinced that the Tax Court's conclusion was clearly erroneous.  Reser had no reason to know that the deductions in question would give rise to a substantial understatement.  Neither did she have a duty to inquire as to the propriety of the deductions.

#### i. Actual knowledge

When Reser signed the joint returns, she thought that

---

[47]Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993); Stevens, 872 F.2d at 1506; Levin v. Commissioner, 53 T.C.M. (CCH) 6 (1987); Cohen v. Commissioner, 54 T.C.M. (CCH) 944 (1987).

she and Don together had invested sufficient funds in DRPC to cover the losses claimed as deductions. Specifically, she (1) had advanced significant amounts of her personal funds for the operating expenses of DRPC; (2) knew that Don had obtained a line of credit from Frost Bank and had invested the funds in DRPC; and (3) knew that Don had written checks on their joint account to DRPC that totaled approximately $135,000.[48] In addition, she was the sole producer of income reported by the Resers in 1987 and 1988. And, importantly, she legitimately anticipated substantial start-up losses, which are typical in such a corporation's initial years of operation and which did in fact occur. Reser testified at trial:

> Well, I understood that Don was starting up his business in these years, and that these were losses incurred in the start-up of the business, and I believed in his abilities with his background in economics from Stanford, a master's in accounting, and a law degree, and his business acumen, that this was a business -- this was normal starting up a business, that there would be losses, and eventually hopefully profits.

---

[48]In 1988, she and Don borrowed jointly $50,000 from Fidelity Bank and invested these funds in DRPC. That same year she allowed Don to withdraw (on penalty for early withdrawal) over $13,000 from two of her IRA's and invest those funds in DRPC.

## ii. Relevant factors

The relevant factors that we are to consider indicate that Reser did not know and did not have reason to know that the deductions in question would give rise to a substantial understatement on the 1987 joint return. First, Reser's education, albeit advanced, provided her with no special knowledge of complex tax issues such as basis computation. She had a background in history and practiced personal injury law. Second, Reser was not personally involved with DRPC's business and financial affairs to any significant degree; rather, she was engaged full-time in her law practice and was the family's sole source of financial support.[49] In addition, she gave birth to their second child in 1987. Third, the record is devoid of evidence of lavish or unusual expenditures compared to the Resers' normal standard of living and spending patterns, which exhibits no notable changes during the years in question. To the contrary, they invested most of Reser's income into DRPC and consumed the rest on the family's living expenses. In

_____

[49]Reser reported income from her full-time law practice of $194,000 in 1987 (but testified that she did not "take home" that much) and $114,000 in 1988.

28

addition, they incurred substantial debt when borrowing money to invest in DRPC. And ultimately, the Resers divorced, and Don filed for bankruptcy. Finally, Reser cannot be penalized for Don's discredited efforts to recast the Frost Bank loan in a tax-favorable light. Indeed, Reser was not even aware of the second set of "promissory notes" until 1991, several years after she had signed the 1987 joint return.

d. Duty to inquire

We are equally convinced that the Tax Court clearly erred in determining under the instant circumstances that Reser had a duty to inquire as to the propriety of the deductions. This is not the typical "dramatic deductions" case in which a cursory review of the return should have alerted Reser that the deductions might not be legitimate. Given Reser's personal knowledge that she and Don had made large infusions of capital into DRPC and that DRPC had generated no income, nothing about the deductions would have put Reser on notice that further inquiry was necessary.

In addition, the Commissioner and the Tax Court both concede that the losses were legitimate deductions at the

29

corporate level; that they produced net losses at the corporate level for tax purposes; that generally S corporation losses pass through to the shareholders; and that the only question is whether the losses are deductible at the level of these particular shareholders due to the basis limitation, which, in turn, rests on the hypertechnical determination whether Don borrowed funds from Frost Bank and loaned them to his corporation (in which case his basis would increase dollar for dollar) or the corporation was the borrower (in which case Don's basis would not be increased).  This case demonstrates that the determination of basis, which limits the deductibility of the losses, is an extremely difficult and technical process.  The issue has been hotly contested and vigorously fought throughout, and even two of the IRS's own agents arrived at different calculations of Don's basis in DRPC for 1987.  We would not expect Reser to question such arguably legitimate, close-call deductions.  Moreover, there can be no doubt that, even if Reser had conducted further inquiry, she would have gotten responses that corresponded exactly to the information as reported on the 1987 joint return.  The

Resers' 1987 joint tax return was prepared by CPA Duane DuLong, who concluded that the Resers were entitled to deduct DRPC's losses.[50] Don testified at trial that when he filed the 1987 and 1988 joint returns, he believed that he had treated DRPC's losses correctly in claiming them as deductions. And John Gwaltney, DRPC's comptroller-accountant, instructed the CPA who prepared the 1988 joint return that the Frost Bank loans were payable to Don individually.

Had Reser asked Don, Gwaltney, or DuLong about the deductions, they would have told her what they believed — that DRPC's losses were properly deductible in full. Neither the court nor the law will penalize Reser for

---

[50]Burnside & Reshebarger, the firm that prepared DRPC's 1987 corporate return, refused at the last minute to prepare the 1987 joint return because of a fee dispute. The record is unclear as to the cause of the fee dispute. The Resers' 1988 joint income tax return was prepared by CPA Stewart Goodson, senior manager in the tax department at Ernst & Young, L.L.P., and signed by CPA Houston Bryan, a partner at that firm. Goodson obtained the necessary information concerning DRPC from John Gwaltney, the comptroller-accountant for DRPC. In the course of two conversations and one meeting with Goodson, Gwaltney provided Goodson with DRPC's financial statements which listed various loans payable by DRPC. Gwaltney instructed Goodson that the loans were actually payable to Don individually. Gwaltney also provided Goodson with DRPC's tax returns for 1987 and 1988 and asked Goodson to determine the Resers' basis in DRPC for purposes of claiming DRPC's losses as deductions.

failing to perform the hollow act of asking questions, the answers to which would have provided no new or different information.

### 5. Inequity

Reser must establish last that it would be inequitable to hold her liable for the tax deficiency on the 1987 joint return.[51] The inequity question is one of fact,[52] and even though we do not ordinarily determine questions of fact for the first time on appeal, both parties expressly conceded at oral argument that we could decide the issue based on the information in the record. With the parties' acquiescence and in the interest of judicial economy, we undertake this task.

The Code and the regulations instruct that inequity is to be determined on the basis of all of the facts and circumstances.[53] The most important factor in determining inequity is whether the spouse seeking relief "significantly benefitted" from the understatement of

---

[51] 26 U.S.C. §6013(e)(1)(D)(1994).

[52] Buchine v. Commissioner, 20 F.3d 173, 181 (5th Cir. 1994).

[53] 26 C.F.R. §1.6013-5(b) (1996).

tax.[54]  The regulations provide that the benefit may be direct or indirect but caution that normal support is not a benefit.[55]

A direct or indirect benefit may be evidenced by (1) a transfer of property,[56] (2) a spouse's receipt of more than she otherwise would as part of a divorce settlement,[57] or (3) an accumulation of savings or other assets in lieu of present consumption.[58]  This list, however, is not exclusive.

Other factors to consider in determining inequity include (1) whether the spouse seeking relief has been deserted or divorced or separated from the other spouse[59]

---

[54]Buchine, 20 F.3d at 181 (citing Belk v. Commissioner, 93 T.C. 434, 440 (1989)).

[55]26 C.F.R. §1.6013-5(b)(1996).

[56]Id.  A transfer of property not traceable to items omitted from income does not constitute a benefit. Ferrarese v. Commissioner, 66 T.C.M. (CCH) 596 (1993), aff'd, 43 F.3d 679 (11th Cir. 1994).

[57]Stiteler v. Commissioner, 69 T.C.M. (CCH) 2975 (1995), aff'd, 108 F.3d 339 (9th Cir. 1997).

[58]Purificato v. Commissioner, 64 T.C.M. (CCH) 942 (1992), aff'd, 9 F.3d 290 (3d Cir. 1993), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398 (1994).

[59]26 C.F.R. §1.6013-5(b); Flynn v. Commissioner, 93 T.C. 355, 367 (1989).

and (2) the probable hardships that would befall the spouse seeking relief if she were not relieved.[60]

The record reveals that Reser did not significantly benefit from the substantial understatement in tax. During the marriage, the Resers did not accumulate any savings or other assets. They invested their sole source of income, Reser's earnings from her legal practice, in DRPC and became indebted to various sources in their efforts to keep DRPC afloat. Instead of experiencing a benefit, their standard of living actually fell.[61] Furthermore, the Resers are now divorced, and there is no record evidence that Reser received more than she otherwise would have as part of the divorce settlement. Taking into account all of the facts and circumstances, we find that it would be inequitable to hold Reser liable for the deficiency.

Reser has borne her burden of establishing every element of the innocent spouse defense. We therefore hold that she is entitled to innocent spouse relief for purposes of the 1987 joint return.

---

[60]_Sanders v. Commissioner_, 509 F.2d 162, 167 n.16 (5th Cir. 1975).

[61]_Belk v. Commissioner_, 93 T.C. 434 (1989).

## B. Negligence Penalty

We turn now to the 1988 joint return, which contains a substantial understatement of tax for which Reser concedes — on the basis of a technicality — she is not entitled to relief as an innocent spouse. As we have already concluded that the Tax Court properly disallowed Don and Reser's deductions of DRPC's losses, we shall address only whether Reser should be held liable for the negligence and substantial understatement penalties attributable to the deficiency on the 1988 joint return.[62] We consider the negligence penalty first.

The Tax Court's determination of negligence is a factual finding which we review for clear error.[63]

Section 6653(a)(1) of the Code imposes an addition to

---

[62]As we have concluded that Reser is an innocent spouse for purposes of the 1987 joint return, she is automatically relieved of liability for the 1987 negligence penalty. Therefore, we need not address whether the Tax Court erroneously calculated that penalty. In addition, we note that the Tax Court's decision did not charge Reser with liability for the 50% interest penalty for the 1988 joint return. See 26 U.S.C. §6653(a)(1)(B)(1994). Thus for the 1988 joint return only the 5% negligence penalty is before us.

[63]Westbrook v. Commissioner, 68 F.3d 868, 880 (5th Cir. 1995); Portillo v. Commissioner, 932 F.2d 1128, 1135 (5th Cir. 1991), rev'd on other grounds, 988 F.2d 27 (5th Cir. 1993).

tax equal to 5% of the entire underpayment if any portion of such underpayment is due to negligence.[64] "'Negligence' includes any failure to make a reasonable attempt to comply with the tax code, including the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances."[65]  The taxpayer bears the burden of establishing the absence of negligence.[66]

The relevant inquiry for the imposition of a negligence penalty is whether the taxpayer acted reasonably in claiming the loss.[67]  The Tax Court found that Reser's reliance on Stewart Goodson, the CPA who prepared the 1988 joint return, was not reasonable, as based on inaccurate information, in light of its decision that there was no separate loan from Don to DRPC.  We find clear error in this conclusion of the Tax Court.

---

[64]26 U.S.C. §6653(a)(1)(1994).

[65]See 26 U.S.C. §6653(a)(3)(1994); Durrett v. Commissioner, 71 F.3d 515, 518 (5th Cir. 1996); Westbrook, 68 F.3d at 880 (quoting Heasley v. Commissioner, 902 F.2d 380, 383 (5th Cir. 1990)).

[66]Westbrook, 68 F.3d at 880; Portillo, 932 F.2d at 1135.

[67]Chamberlain v. Commissioner, 66 F.3d 729, 733 (5th Cir. 1992).

For the same reasons that we concluded that Reser did not have reason to know of the substantial understatement on the 1987 joint return,[68] we conclude that she acted reasonably in relying on the professionals who prepared the 1988 joint return. In fact, but for her failure to meet a technical requirement, she would have been an innocent spouse for purposes of the 1988 joint return. Goodson and Bryan, two CPA's at a national accounting firm, both agreed that the Resers' basis in DRPC was sufficient to claim the losses as deductions. As we stated in Chamberlain v. Commissioner,[69] "[t]o require the taxpayer to challenge the [expert], to seek a 'second opinion,' or try to monitor [the expert] on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place."[70] Furthermore, Reser was wholly unaware of Don's belated attempt to recast the Frost Bank loan to his tax advantage.

We conclude that Reser was not negligent with respect

---

[68]See supra at Part II (A)(4).

[69]Id.

[70]Id. at 732 (quoting United States v. Boyle, 469 U.S. 241, 251 105 S. Ct. 687, 692-93 (1985)).

to the 1988 joint return and, therefore, is not liable for the negligence penalty.

## C. Substantial Understatement Penalty

Finally, we address the substantial understatement penalty. Section 6661 provides for an addition to tax equal to 25% of the amount of any underpayment attributable to a substantial understatement of tax.[71]

A taxpayer may be granted relief from all or any part of the addition to tax, however, if he shows that there was reasonable cause for the understatement (or part thereof) and that he acted in good faith.[72] The regulations provide that reliance on the advice of a

---

[71]26 U.S.C. §6661(a)(1994). That section also provides for a reduction of the understatement if there was substantial authority for the taxpayer's treatment of the item causing the understatement. 26 U.S.C. §6661(b)(2)(B)(I)(1994). The Tax Court concluded that there was no substantial authority for Don to increase his basis in DRPC by the amount of the Frost Bank loan proceeds, and we find no error in this determination. The only authority for allowing a shareholder to increase his basis in a corporation when he guarantees a debt of the corporation is the Eleventh Circuit's decision in Selfe v. Commissioner, 778 F.2d 769 (11th Cir. 1985). But we are not bound by another circuit's decision. Furthermore, the Tax Court rejected that case in Leavitt v. Commissioner, 90 T.C. 206 (1988)(decided February 1988), aff'd, 875 F.2d 420 (1989)(decided May 1989), well over a year before the Resers filed their 1988 joint return (filed October 1989).

[72]26 U.S.C. §6661(c)(1994).

professional, such as an accountant, or on other facts may constitute a showing of reasonable cause and good faith if, under all of the circumstances, such reliance was reasonable and the taxpayer acted in good faith.[73] We have just concluded that Reser acted reasonably in relying on the professionals who prepared the 1988 joint return and would have been an innocent spouse for purposes of that return but for her failure to meet a technical requirement. As relief from the substantial understatement penalty does not depend on the taxpayer's ability to meet the technical requirement that was fatal to Reser's innocent spouse defense for the 1988 joint return, we exonerate her from liability for this penalty. Any other conclusion would be absurdly inconsistent with our earlier holdings.

## III.

## CONCLUSION

As there was no legitimate debt between Don and DRPC, we conclude that Don was not entitled to increase his basis in DRPC by the amount of the Frost Bank loan proceeds. Consequently, we affirm the Tax Court's

---

[73]26 C.F.R. §1.666-6(b); Heasley, 902 F.2d at 385.

holding that the Resers could not properly deduct DRPC's losses on their 1987 and 1988 joint tax returns.

We conclude also that Reser is entitled to relief as an innocent spouse for the 1987 joint return and, therefore, reverse the Tax Court's contrary holding. First, the disallowed deductions are grossly erroneous items and create the substantial understatement of tax on the 1987 joint return. Second, Reser neither knew nor had reason to know that the deductions claimed on the 1987 joint return would give rise to a substantial understatement of tax. Neither did she have a duty to inquire as to the propriety of the deductions, as any further inquiry would have been informatively futile under the discrete facts of this case. Finally, it would be inequitable to hold Reser liable for the tax deficiency.

Significantly, we hold that henceforth in erroneous deduction cases in this circuit, the proper inquiry concerning a spouse's knowledge is whether the spouse seeking relief knew or had reason to know that the deductions in question would give rise to a substantial understatement, not whether he knew or had reason to know

of the existence of the underlying transaction.

Lastly, we hold that Reser is not liable for the negligence and substantial understatement penalties attributable to the deficiency on the 1988 joint return.


For the foregoing reasons, we affirm the Tax Court's decision disallowing the Resers' deductions of DRPC's losses on the 1987 and 1988 joint returns, but we reverse the judgment of the Tax Court insofar as it holds Reser liable for (1) the deficiency in tax, including penalties, interest, and other amounts, attributable to the substantial understatement of tax on the 1987 joint return and (2) the negligence and substantial understatement penalties attributable to the deficiency on the 1988 joint return; and we hold that she is not liable for the same.

AFFIRMED in part; REVERSED and RENDERED in part.