T.C. Memo. 2006-83

UNITED STATES TAX COURT

LARRY G. BANGS AND MARY L. BANGS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17415-04.                    Filed April 24, 2006.

<u>W. Alan Lautanen</u>, for petitioners.

<u>Erin K. Huss</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes and accuracy-related penalties
under section 6662(a)[1] for 1999, 2000, 2001, and 2002 (the years
at issue).  For 1999, respondent determined a $14,335 deficiency
and determined that petitioners were liable for a $2,867

---

[1]All section references are to the Internal Revenue Code for
the years at issue, and all Rule references are to the Tax Court
Rules of Practice and Procedure, unless otherwise indicated.

accuracy-related penalty.  For 2000, respondent determined an $11,159 deficiency and determined that petitioners were liable for a $2,231 accuracy-related penalty.  For 2001, respondent determined a $7,605 deficiency and determined that petitioners were liable for a $1,521 accuracy-related penalty.  For 2002, respondent determined an $11,413 deficiency and determined that petitioners were liable for a $2,282 accuracy-related penalty.

After concessions, there are three issues for decision.  The first issue is whether petitioners engaged in their lemon farming activity for profit.  We hold they did not.[2]

The second issue is whether petitioners are liable for taxes on interest and capital gains they admit they earned during the years at issue but which were erroneously omitted on the Form 4549A, Income Tax Examination Changes, petitioners signed.  We hold petitioners are liable for the taxes on the interest and capital gains.

The third issue is whether petitioners are liable for the accuracy-related penalty.  We hold they are liable for the accuracy-related penalty except with respect to the portion of the understatement attributable to the lemon farming activity.

---

[2]If we had found petitioners engaged in their lemon farming activity for profit, we would have then been asked to consider whether petitioners should have capitalized, rather than deducted, their expenses relating to their lemon farming activity.  Because of our holding on the for profit issue, we need not address the capitalization issue under sec. 263A.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the accompanying exhibits are incorporated by this reference. Petitioners resided in California at the time they filed the petition in this case.

Petitioners

Petitioner Larry Bangs (Mr. Bangs) was raised and met his future wife in a small farming town in Kansas. Mr. Bangs and his future wife decided to move to California in 1964 to seek warmer weather after Mr. Bangs spent some time in college and worked in the salt mines. They were then married.[3]

Mr. Bangs accepted a job at Standard Oil in California. He started in a plant and then moved to the sales department, where he sold polyester resin for 6 years. His sales experience and entrepreneurial drive convinced him to start a new business with his wife. They began their own business distributing fiberglass products. The business was successful and grew into fiberglass manufacturing as well. Petitioners explored several different business opportunities, some of which were successful. Petitioners found success in manufacturing plastic lettering, manufacturing chemical tanks, and designing the curled tail on the back of skateboards. Petitioners lost money in jet ski manufacturing, however, and they discontinued it when it was not

---

[3] We refer to petitioner Mary Bangs as Mrs. Bangs.

profitable.  Petitioners eventually sold the fiberglass business for several million dollars in the early 1980s.

Petitioners considered themselves retired after they sold their fiberglass business, when Mr. Bangs was approximately 40 years old.  Petitioners owned several rental properties during the years at issue that generated between $400,000 and $500,000 annually in gross income.

<u>The Farming Activity</u>

Petitioners purchased 40 acres of land in California's Valley Center area in 1971.  They had been looking for property for some time and were able to obtain this property at a good price.  When petitioners sold their fiberglass business in the early 1980s, they decided to build a 6,000 square foot house on the Valley Center property.  Mr. Bangs hoped to get back to farming and was looking for something he could do in his backyard when he was 70 and retired.  Petitioners had fond memories of farming from their youth and were interested in learning whether it was possible to replicate their experiences in California.

Petitioners spoke to an agricultural adviser and asked what type of crop could be grown on the land.  This expert advised petitioners to grow lemons because they were fairly hardy and could thrive with little water.  Mr. Bangs also learned that lemon trees had a long life.

Petitioners planted some lemon trees on their property in the early 1990s.  The record is unclear, however, how many trees were planted.  Petitioners also made some improvements to their

property. They built a warehouse, a ripening room, and added water pumps. Petitioners also had a large well on the property that was producing more water than necessary for the lemon trees, so petitioners also decided to raise catfish. They watered the lemon trees with refuse or runoff water from the catfish tanks, but when the catfish venture was unsuccessful, petitioners abandoned it.

Mr. Bangs decided in 1994 to harvest some lemons. He decided to harvest less than 4 years after planting the trees even though he was aware that it would take 10 years before the trees would fully produce. He also knew that it might stunt the growth of the trees but he was anxious to see how the lemon market worked. Petitioners sold these lemons to a packing house in Rancho Santa Fe and reported $469 of income from lemon sales in 1994.

Mr. Bangs claimed that he spent 60 to 80 hours per week on the lemon farming activity, and claimed that petitioners together spent between 80 to 90 hours per week on the activity. Mr. Bangs pruned and weeded the tree area, repaired equipment, and did other activities. Mrs. Bangs did both physical work and kept the financial records. Petitioners did not employ any outside employees.

Mrs. Bangs was responsible for the financial records of the farming activity. The only financial records for the activity, however, consisted of stacks of receipts. Petitioners did not

have a business plan, a separate bank account, nor any books and records in which income and expenses were recorded.

Petitioners reported income, expenses, and gain or loss on Schedule F, Profit or Loss from Farming, to their income tax returns for 1993 through 2002 as follows:

| Year | Income | Expenses | Gain (Loss) |
|------|--------|----------|-------------|
| 1993 | -- | $47,687 | $(47,687) |
| 1994 | $469 | 63,699 | (63,230) |
| 1995 | 1,343 | 43,952 | (42,609) |
| 1996 | 1,341 | 37,484 | (36,143) |
| 1997 | 2,728 | 39,922 | (37,194) |
| 1998 | [1]556 | 35,278 | (34,722) |
| 1999[2] | -- | 28,935 | (28,935) |
| 2000[3] | -- | 37,853 | (37,853) |
| 2001 | -- | 16,591 | (16,591) |
| 2002 | -- | 33,535 | (33,535) |

[1] While the Schedules F for 1995 through 1998 indicate that petitioners earned some income from farming during these years, there is no indication that this income was from lemon sales, nor did petitioners introduce receipts from lemon purchasers as they did for the 1994 income.

[2] The amounts reported here for 1999, 2000, and 2001 are from petitioners' pro forma returns, not petitioners' original individual income tax returns. Petitioners' original 1999 return reported a portion of this loss, and the record reflects that the remainder of this loss was reported on a trust return. See infra, pp. 7-8.

[3] Petitioners' original returns for 2000 and 2001 did not reflect any lemon farming activity because petitioners included it on a trust return for those years. The income, expenses, and losses for 2000 and 2001 were included on the pro forma returns.

The income petitioners reported in 1994 through 1998 was insufficient to cover the property taxes.

Respondent audited petitioners' return for 1995. In that audit, respondent did not disallow the deductions petitioners claimed in connection with their farming activity for that year.

Several natural events occurred during the years at issue that impacted the lemon farming activity. A 1993 wildfire destroyed some of the lemon trees. Poor soil conditions led petitioners to consult a supervising plant pathologist in 1997 out of concern for their trees' health. The pathologist examined the trees and noted that they looked unhealthy and had curled yellow leaves. The pathologist reported that these problems could be due to the soil staying wet too long or to a mineral deficiency. Petitioners also claim they experienced a water shortage during the years at issue. Petitioners drilled additional wells in 2000 and 2002, but their efforts did not produce any additional water. Mr. Bangs indicated at trial that he would await the outcome of this case before he decided whether to drill more wells on the property.

The Trust Scheme

Petitioners became involved in a trust scheme in 1999. They did not consult an attorney or CPA before they bought into the scheme. Petitioners transferred title to most of their assets to trusts to avoid paying taxes on the income from these assets. Petitioners, in contrast to the lack of records for lemon farming, kept detailed books and records relating to their trusts. The trust-related financial records included balance sheets, capital gain reports, and transaction reports by

category.  There was no record of the lemon farming activity in any of the trust records, but detailed records of petitioners' investment and rental activities were included in the trust records.  Losses from the lemon farming activity were deducted on a trust return for at least 1999 and 2000, however.

On audit, the revenue agent informed petitioners that the trusts would be collapsed.  Petitioners decided to hire a CPA to prepare pro forma returns so petitioners would be better prepared to settle with respondent.  The pro forma returns aggregated the amounts reported on the trust returns and the amounts reported on individual returns for the years at issue.  Petitioners and the revenue agent were unable, however, to resolve the lemon farming activity issues.

During the course of the audit, respondent's revenue agent asked to tour the property.  Petitioners would not permit the revenue agent to tour the property and would not answer questions about their farming activity.  Respondent issued a summons to petitioners to permit the revenue agent to tour petitioners' property.  When the revenue agent was finally permitted to visit the property, she noted that the trees did not look healthy and that some were dead.  She also noted that the trees on the property across from petitioners' property, on the other hand, were healthy and thriving.  The revenue agent also noticed that petitioners were storing yard items in the ripening room and the warehouse storage held several classic cars in various stages of repair.

Respondent's revenue agent sent petitioners a number of documents in September 2003 to resolve all non-farming activity issues after she reviewed petitioners' pro forma returns. These documents included Form 4549A, Form 870, Waiver of Restrictions on Assessment, Form 906, Closing Agreement Covering Specific Matters (the closing agreement), and Form 872, Consent to Extend the Time to Assess Tax. Petitioners needed to extend the period of limitations because the period for 1999 would soon expire.

The closing agreement resolved the dispute relating to the proper treatment of the trusts. In it, the parties agreed that the trusts would be disregarded and the trusts were petitioners' alter egos. Petitioners also agreed that they would report on individual returns for 1999 and subsequent years all income, expenses, and deductions, as allowed by the Code. In addition, the parties agreed that petitioners would be liable for additional taxes, penalties, and interest on their individual returns due to collapsing the trusts.

Petitioners signed each document and returned them to the revenue agent. Respondent also executed the closing agreement. Shortly after petitioners signed these documents, the revenue agent discovered that she had made errors in the Form 4549A petitioners signed. The revenue agent had inadvertently omitted interest income that petitioners had shown on their pro forma returns, and she miscalculated the amount of capital gains. Petitioners apparently did not notice these mistakes when they

executed the documents. The revenue agent sent petitioners a corrected Form 4549A, which petitioners refused to sign.

Respondent mailed a deficiency notice to petitioners on June 18, 2004, in which respondent computed the deficiency amounts from the original returns petitioners filed for the years at issue. Petitioners timely filed a petition with this Court contesting respondent's disallowance of the lemon farming expenses for 1999 and 2002[4] and asserting that petitioners were entitled to additional deductions for lemon farming expenses in 2000 and 2001.[5] Petitioners are also contesting the treatment of the interest and capital gains and the imposition of the accuracy-related penalty.

---

[4]It appears from the record that a portion of the losses from the lemon farming activity was reported on petitioners' individual returns for 1999 and a portion of the losses were reported on a trust return for that year.

[5]Respondent disallowed the lemon farming expenses for 1999 and 2002 in the deficiency notice, but the lemon farming expenses for 2000 and 2001 were not reported on petitioners' original returns. Respondent did not disallow the lemon farming expenses for 2000 and 2001 in the deficiency notice because respondent computed the deficiencies from the original returns petitioners filed. Petitioners deducted the lemon farming expenses on a trust return for 2000, and we assume petitioners also deducted them on a trust return for 2001, although the record is not clear. Petitioners assert in their petition that they are entitled to additional deductions for 2000 and 2001 for their lemon farming activity that were unreported on their original returns. Petitioners' assertion in their petition is consistent with petitioners' position on their pro forma returns, which do include deductions for lemon farming expenses for all years.

OPINION

There are several issues for decision.  We are asked to decide, first, whether petitioners engaged in their lemon farming activity for profit.  We are also asked to decide whether petitioners are liable for taxes on interest income and capital gains that petitioners admit they earned for the years at issue, but were excluded from the initial Form 4549A petitioners signed. Finally, we must decide whether petitioners are liable for the accuracy-related penalty for each of the years at issue.  We address each of these issues in turn, after first considering the burden of proof.

I.   Burden of Proof

In general, the Commissioner's determinations in the deficiency notice are presumed correct, and the taxpayer bears the burden of proving that the Commissioner's determinations are in error.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Section 7491(a) shifts the burden of proof to the Commissioner with respect to a factual issue relevant to a taxpayer's liability for tax, however, under certain circumstances.  The burden shifts to the Commissioner if the taxpayer introduces credible evidence with respect to the issue, complies with substantiation requirements, maintains all required records, and cooperates with the Commissioner's reasonable

requests for witnesses, information, documents, meetings, and interviews. Sec. 7491(a)(2)(A) and (B).[6]

We find that petitioners failed to comply with respondent's reasonable requests. Id. Although petitioners produced documents respondent requested, petitioners refused to answer respondent's questions about their farming activity. Respondent was forced to issue petitioners a summons to obtain necessary information to complete the audit. Accordingly, we find that the burden of proof remains with petitioners.

## II. Whether Petitioners Engaged in Their Lemon Farming Activity for Profit

### A. Section 183 Generally

We now address whether petitioners engaged in their lemon farming activity for profit within the meaning of section 183 during the years at issue. Section 183(a) provides generally that if an individual engages in an activity and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Deductions that would be allowable without regard to whether the activity is engaged in for profit are allowed under section 183(b)(1). Deductions that would be allowable only if the activity were engaged in for profit are allowed under section 183(b)(2), but only to the extent that the

---

[6]Sec. 7491 is effective with respect to court proceedings arising in connection with examinations by the Commissioner commencing after July 22, 1998, the date of enactment of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(a), 112 Stat. 726.

gross income from the activity exceeds the deductions allowable under section 183(b)(1).

We follow the Court of Appeals opinion squarely in point when appeal from our decision would lie to that court absent stipulation by the parties to the contrary. Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Taxpayers residing in the Ninth Circuit, such as petitioners, must prove they conducted their activities with the primary, predominant, or principal purpose of realizing an economic profit independent of tax savings. See Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg T.C. Memo. 1991-212; Polakof v. Commissioner, 820 F.2d 321, 323 (9th Cir. 1987), affg. T.C. Memo. 1985-197; Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472.

Whether a taxpayer has the primary, predominant, or principal purpose of realizing an economic profit independent of tax savings is determined on the basis of all surrounding facts and circumstances. Polakof v. Commissioner, supra at 324; Indep. Elec. Supply, Inc. v. Commissioner, supra at 727; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(b), Income Tax Regs. While a taxpayer's expectation of profit need not be reasonable, there must be a good faith objective of making a profit. Allen v. Commissioner, 72 T.C. 28, 33 (1979); sec. 1.183-2(a), Income Tax Regs.

B.    Nine Factors

We structure our analysis around nine nonexclusive factors. Sec. 1.183-2(b), Income Tax Regs.  The nine factors are:  (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.  Id.

No factor or set of factors is controlling, nor is the existence of a majority of factors favoring or disfavoring a profit objective necessarily controlling.  Hendricks v. Commissioner, 32 F.3d 94, 98 (4th Cir. 1994), affg. T.C. Memo. 1993-396; Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); sec. 1.183-2(b), Income Tax Regs.  The individual facts and circumstances of each case are the primary test.  Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Allen v. Commissioner, supra at 34; sec. 1.183-2(b), Income Tax Regs.

C.    Applying Factors to Facts

Nearly all of the factors in this case indicate that petitioners did not engage in their lemon farming activity for profit.

Petitioners did not conduct their activity in a businesslike manner.  Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs.  For example, they did not have a written business plan, any financial statements, or any financial data pertaining to their lemon farming activity other than a stack of receipts.  This dearth of financial records is in stark contrast to their financial records for their abusive trusts.  Petitioners had copious records for the trusts including transaction reports by category, balance sheets, and capital gain reports.  Moreover, petitioners were unable to articulate how they intended to earn a profit, and it is unclear from the record how many trees they had on the property at any given time. Petitioners also claim that they attempted changes to their lemon farming activity when they experienced a water shortage.  While they introduced evidence that they drilled additional wells, petitioners did not indicate any other methods they attempted to supply water to their land.

Petitioners also have not shown that they studied the accepted business, economic, and scientific practices involved in lemon farming.  See sec. 1.183-2(b)(2), Income Tax Regs.  While Mr. Bangs likely had some general farming experience from his youth and he consulted an adviser regarding which crop to raise,

petitioners failed to introduce any evidence that they consulted any other sources before beginning the lemon farming activity. After they began the lemon farming activity, petitioners consulted an expert, a supervising plant pathologist, only once.

Petitioners also intentionally took measures that they knew would harm their trees, such as harvesting lemons too early. Mr. Bangs was impatient and wanted to test how the market worked, although he knew it could harm the trees. There is also no evidence that petitioners took any action to correct the poor soil quality or did anything to overcome the water retention problem noted by the supervising plant pathologist in 1997.

We also found petitioners' testimony regarding the time and effort they spent on the lemon farming activity not credible. See sec. 1.183-2(b)(3), Income Tax Regs. Mr. Bangs testified that he spent 60 to 80 hours per week, and petitioners together spent 80 to 90 hours per week on the lemon farming activity. Petitioners were engaged in many pursuits during the years at issue, not the least of which was a profitable rental real estate and investment activity. It is difficult to imagine how anyone would spend 80 to 90 hours per week caring for an undetermined number of lemon trees, some of which had died, and give only secondary attention to the rental real estate and investment activity that generated significant gross income of approximately $450,000 annually. Moreover, despite claiming that they spent so much time and effort on their lemon farming activity during the

years at issue, petitioners failed to document the activity in their trust-related financial records.

Petitioners do not contend that they were relying upon the property's value increasing for them to generate profit from the lemon farming activity. See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); sec. 1.183-2(b)(4), Income Tax Regs. They do assert, however, that they expected the lemon trees to appreciate as fruit production increased. Selling the trees to realize this appreciation is counter to their argument that they were selling lemons for profit.

Petitioners succeeded in other pursuits. None was similar to the lemon farming activity. See Haladay v. Commissioner, T.C. Memo. 1990-45; Daugherty v. Commissioner, T.C. Memo. 1983-188. Petitioners grew their fiberglass business into a successful enterprise that they sold for several million dollars. Petitioners also have a successful rental real estate and investment operation. These activities, however, are quite dissimilar to lemon farming. Petitioners' success in these dissimilar activities does not lead us to conclude that the lemon farming activity will eventually become profitable as well. See Haladay v. Commissioner, supra.

We find just as telling that petitioners were involved in unprofitable businesses, all of which they abandoned. These included jet ski manufacturing and catfish farming. Yet, unlike the other unprofitable enterprises, petitioners have not

abandoned the lemon farming activity. In fact, Mr. Bangs indicated at trial that he would await the outcome of this case before he decided whether to drill more wells on the property. Such conduct is inconsistent with a predominant, principal, or primary purpose of making a profit from the activity.

Moreover, petitioners sustained large losses from the lemon farming activity from the start and continuing through the years at issue. See Golanty v. Commissioner, 72 T.C. 411, 427 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b)(6), Income Tax Regs. The initial losses contained an element of startup costs and involved factors unique to lemon growing. Petitioners were aware that it would take 10 years before the lemon trees reached full production. The losses continued, consistent with this forecast, for at least 9 years after petitioners began the lemon farming activity.

The losses continued for all of the years at issue, well beyond the startup phase of the activity. See Engdahl v. Commissioner, supra; sec. 1.183-2(b)(6), Income Tax Regs. Petitioners contend that these continued losses were due to unforeseen events beyond their control, such as the wildfire and the water shortage. See sec. 1.183-2(b)(6), Income Tax Regs. We find petitioners' testimony regarding the water shortage lacks credibility. For example, the pathologist who examined petitioners' trees in 1997 noted that the problems with their trees might be due to the soil staying wet for too long.

Moreover, the trees on the property across from petitioners' land looked healthy.

Petitioners sold their fiberglass business in the early 1980s for several million dollars and currently have a profitable rental real estate activity. Petitioners consider themselves retired. The large losses they claim from their lemon farming activity partially offset petitioners' substantial income from their non-farming activities. Petitioners therefore had an incentive to incur losses in the farming activity. See Jackson v. Commissioner, 59 T.C. 312, 317 (1972).

Petitioners have a 6,000 square foot home on the Valley Center property where they conduct their farming activity. Mr. Bangs wanted to have something to do in his backyard when he retired. Petitioners have fond memories of farming from their youth and had always hoped to get back to farming. They were pleased that they could do so raising citrus trees in California, a warm climate. See id.; sec. 1.183-2(b)(9), Income Tax Regs. We find that petitioners derived personal pleasure from their farming activity, which is an indication that petitioners did not engage in the activity for profit.

Based on all of the facts and circumstances, we find that petitioners have not shown they conducted their lemon farming activity with the primary, predominant, or principal purpose of realizing an economic profit independent of tax savings. See Wolf v. Commissioner, 4 F.3d at 713; Polakof v. Commissioner, 820

F.2d at 323; Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d at 726.

III. Petitioners' Liability for Taxes on Interest Income and Capital Gain

We next consider whether petitioners are liable for taxes on interest income and capital gains they reported on their pro forma returns, but that respondent erroneously omitted on respondent's initial Form 4549A. Petitioners argue that they had a "deal" with respondent when they signed the Form 4549A and executed a closing agreement. Petitioners further argue that respondent should be prevented from asserting that petitioners owe any amounts beyond those shown on the Form 4549A they signed. Respondent, on the other hand, asserts that a Form 4549A is not final and conclusive as to all issues. Moreover, respondent argues that the closing agreement did not determine petitioners' total tax liability for the years at issue. We agree with respondent.

It is well settled that Forms 4549A do not bind the Commissioner. Urbano v. Commissioner, 122 T.C. 384 (2004); Hudock v. Commissioner, 65 T.C. 351, 362 (1975). Only closing agreements entered into pursuant to section 7121 are binding on the Commissioner as to a determination of the taxpayer's final tax liability. See Urbano v. Commissioner, supra at 393.

Petitioners executed a closing agreement on Form 906 with respect to the abusive trust scheme. We found as a fact at trial that the closing agreement was binding as to the matters addressed in the agreement. This closing agreement, however,

covers only specific matters; in this case, the treatment of the trusts. The closing agreement does not cover other issues or determine petitioners' tax liability for the years at issue. Urbano v. Commissioner, supra. Accordingly, the closing agreement does not prevent respondent from determining deficiencies or penalties for the years at issue. In fact, the parties agreed in the closing agreement that petitioners would report all income, expenses, and deductions on their individual returns for the years at issue. The closing agreement also provides that petitioners will be liable for additional taxes, penalties, and interest that may arise on their individual returns by collapsing the trusts. Accordingly, the terms of the closing agreement provide that petitioners shall be liable for taxes on their income for the years at issue.

Respondent was therefore not prevented from determining that petitioners owe taxes on interest income and capital gains they admitted they received during the years at issue. We find that petitioners are liable for these taxes.

IV. Whether Petitioners Are Liable for the Accuracy-Related Penalty

The next issue is whether petitioners are liable for the accuracy-related penalty under section 6662(a). Respondent determined that petitioners were negligent and therefore liable for the penalty.[7]

---

[7]Respondent also asserts that petitioners substantially understated their tax and are therefore liable. Because we find that petitioners were negligent, we need not consider whether
(continued...)

Section 6662(a) and (b)(1) imposes a penalty equal to 20 percent of the portion of an underpayment of income tax attributable to negligence. Negligence is defined as "any failure to make a reasonable attempt to comply with the provisions of * * * [the Code]". Sec. 6662(c). Negligence is the lack of due care or the failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent has the burden of production regarding penalties and must come forward with sufficient evidence that it is appropriate to impose the penalty. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

Petitioners' adjustments were due in part to their abusive trusts. We have found taxpayers negligent who use trusts in flagrant tax avoidance schemes. See, e.g., Wesenberg v. Commissioner, 69 T.C. 1005, 1015 (1978); Castro v. Commissioner, T.C. Memo. 2001-115; Hanson v. Commissioner, T.C. Memo. 1981-675, affd. per curiam 696 F.2d 1232 (9th Cir. 1983). We conclude that respondent has satisfied his burden of production and has shown that petitioners' underpayment of tax was due to negligence.

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment, however, if a taxpayer shows that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, that portion. Sec.

_____

[7](...continued)
petitioners substantially understated their tax.

6664(c)(1); sec. 1.6664-4(b), Income Tax Regs. Petitioners have the burden of proving that the accuracy-related penalty does not apply. See Higbee v. Commissioner, supra at 446. The determination of whether the taxpayers acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the knowledge and experience of the taxpayers, and the reliance on the advice of a professional. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners argue that they acted with reasonable cause regarding the lemon farming activity. Petitioners deducted the same expenses on previous returns, and the Commissioner did not disallow those deductions in an earlier audit. Sheehy v. Commissioner, T.C. Memo. 1996-334. A similar deduction allowed on audit for an earlier year may be one factor to be considered in determining whether the accuracy-related penalty applies. See Stewart v. Commissioner, T.C. Memo. 2002-199; Sheehy v. Commissioner, supra.

We note that the inquiry into whether an activity was engaged in for profit is a facts and circumstances test. We find it was reasonable for petitioners to believe the deductions were permitted when a previous audit did not require changes. See Sheehy v. Commissioner, supra. Based on all of the facts and circumstances of this case, we find that petitioners had reasonable cause for and acted in good faith with respect to the treatment of their lemon farming activity. We accordingly find

that petitioners are not liable for the accuracy-related penalty as it relates to this portion of the underpayment.

The other items on petitioners' returns for the years at issue are not accorded the same treatment. These other non-lemon farming activity items, including the abusive trust items, were not considered in the prior audit. Petitioners have not shown a genuine effort to assess their proper tax liability, nor have they shown that they relied on the advice of a professional with respect to these items. See sec. 1.6664-4(b)(1), Income Tax Regs. Petitioners have not shown they acted with reasonable cause and in good faith with respect to these non-lemon farming activity items, and, accordingly, they are liable for the accuracy-related penalty on the portion of the underpayment attributable to these items.

To reflect the foregoing and the concessions of the parties,

Decision will be entered

under Rule 155.