T.C. Memo. 2016-170

UNITED STATES TAX COURT

BARNHART RANCH, CO., ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 19458-14, 19459-14,     Filed September 14, 2016.
19460-14.

<u>Donald Frederick Wood</u>, <u>Juliana D. Hunter</u>, and <u>Marisa S. Secco</u>,

for petitioners.

<u>M. Kathryn Bellis</u> and Yvette Nunez (student), for respondent.

---

[1]Cases of the following petitioners are consolidated herewith:  L. Irvin
Barnhart, Deceased, Paul F. Barnhart, Jr., Independent Executor, docket No.
19459-14; and Paul F. Barnhart, Jr. and Karol Ann Barnhart, docket No. 19460-
14.

[*2] MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  In these consolidated cases, respondent determined deficiencies and penalties as follows:

<u>Barnhart Ranch, Co., Docket No. 19458-14</u>

| Year | Deficiency | Penalty sec. 6662(a) |
|---|---|---|
| 2012 | --- | --- |
| 2013 | $231,903 | $46,380.60 |

<u>L. Irvin Barnhart, Deceased, Paul F. Barnhart, Jr., Independent Executor, Docket No. 19459-14</u>

| Year | Deficiency | Penalty sec. 6662(a) |
|---|---|---|
| 2010 | $150,120 | $30,024.00 |
| 2011 | 100,880 | 20,176.00 |
| 2012 | 171,313 | 34,262.60 |

<u>Paul F. Barnhart, Jr. and Karol Ann Barnhart, Docket No. 19460-14</u>

| Year | Deficiency | Penalty sec. 6662(a) |
|---|---|---|
| 2010 | $159,876 | $31,975.20 |

| | | |
|---|---|---|
| **[*3]** 2011 | 103,482 | 20,696.40 |
| 2012 | 174,675 | 34,935.00 |

Any reference to a tax year for Barnhart Ranch, Co. (BRC), is to its applicable fiscal year ending June 30th.  Unless otherwise indicated all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions the issues for decision are:  (1) whether BRC, and not the other petitioners, is the taxpayer to whom the net losses from a cattle ranching operation (cattle operation) for its tax years in issue are attributable and, if so, (2) whether BRC acted as an agent of the other petitioners with respect to the cattle operation and, if not, (3) whether petitioners, other than BRC, are liable for section 6662(a) penalties for 2010, 2011, and 2012.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.  At the time their petitions were filed, Paul F. Barnhart, Jr. (petitioner), his brother L. Irvin Barnhart (Irvin Barnhart) (collectively, the Barnhart brothers), and petitioner's wife Karol Ann Barnhart resided in Texas, and BRC had its principal place of business in Texas.

**[\*4]**    Starting in the 1950s the father of the Barnhart brothers ran operations of oil and gas and cattle ranching (family businesses).  The cattle operation comprised, essentially, two separate ranches in Texas:  (1) the Hebbronville ranch, approximately 9,069 acres, and (2) the Westhoff ranch, approximately 14,737 acres.  It involved two lines of animal production:  "registered", which produced purebred, pedigreed cattle for breeding, and "commercial", which produced calves sold by weight for beef.

In 1961 the father formed and was the sole shareholder of Barnhart Co., a domestic for-profit corporation under Texas law.  According to its articles of incorporation, the purpose of Barnhart Co. was to pursue actively multiple aspects of oil and gas, construction, real property, merchandise, intellectual property, and livestock enterprises, including the buying, owning, raising, and selling of cattle.  Barnhart Co. adopted a "joint interest accounting system"--an accounting method (joint interest billing) normally used in the oil and gas industry--for the family businesses, including the cattle operation.

Effective as of December 31, 1979, the father transferred all cattle from the cattle operation at that time to the Barnhart brothers and their sister.  Their sister then sold her interest in the cattle to the Barnhart brothers effective as of that same day.  These actions resulted in the Barnhart brothers' having owned at least 4,899

[*5] head of cattle. Their father purchased additional cattle in the 1980s, and he gifted cattle to the Barnhart brothers in 1991 and 1992, as well. Now under the control of the Barnhart brothers, the cattle operation became a purely commercial production enterprise by 1994.

On September 14, 1994, petitioner incorporated BRC, a Texas for-profit corporation owned by the Barnhart brothers as its two equal shareholders. BRC was created specifically for the cattle operation (even though its articles of incorporation broadly stated its purpose as "the transaction of any or all lawful business for which corporations may be incorporated" under Texas law). BRC did not replace Barnhart Co., which continued its other business activities; and for many years, including the years in issue, petitioner and Irvin Barnhart would serve as the president and vice president, respectively, of both BRC and Barnhart Co.

Donald W. Sronce, who has a master's degree in ranch management, has managed the cattle operation since BRC's inception. His supervisory services included, inter alia, building fences, gathering cattle, separating and penning cattle, working cattle down chutes, giving vaccinations, repairing equipment, dealing with contractors, and inventory (performed by a head count but without reporting to accounting how each head of cattle was originally acquired). Sronce was paid for his services by BRC, and he consulted with petitioner on all major

**[*6]** decisions regarding the cattle operation, including purchasing and selling cattle and setting the annual budget.

From 2010 to 2012 the cattle operation had 17 employees, and BRC, using ADP Payroll Services, paid these employees. The employees included Sronce, his son Matt, who helped supervise operational activities, and his wife Sharon, who served as an office manager, maintaining financial, operational, production, and employment records. The remaining employees consisted of ranch hands, a housekeeper, and a part-time employee of the Hebbronville ranch who provided security and oversaw the employees working there. BRC filed Forms 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, Forms 943, Employer's Annual Federal Tax Return for Agricultural Employees, and Forms W-3, Transmittal of Wage and Tax Statements, with respect to these employees and issued to them Forms W-2, Wage and Tax Statement.

BRC held a workers' compensation and employer's liability insurance policy in its name with respect to the cattle operation employees. It purchased and held farm and ranch insurance in its name that covered both the Westhoff and Hebbronville ranches. It also purchased in its name a buckskin gelding, bought a utility task vehicle equipped with a winch, and held title to several other vehicles.

**[*7]** BRC, as the recorded buyer or the recorded seller, also bought and sold cattle for the cattle operation. These sales and purchases, made at livestock auctions and other venues, occurred under the names "Barnhart Ranch Company", "Barnhart Ranch Co.", and "Barnhart Ranch". In 2010 the cattle operation sold about 600 cattle, in 2011 it sold about 1,500, and in 2012 it sold about 800.

The cattle operation used acreage that was leased from the owners of the land where the Hebbronville and Westhoff ranches were situated--the owners being four Texas limited partnerships and a trust. Petitioner served as the trustee of the trust, while the Barnhart brothers were general partners in two of the partnerships; petitioner was the sole general partner in one partnership; and petitioner served as trustee for his children who were general partners in the last partnership along with Irvin Barnhart. Three of these partnerships leased the Hebbronville ranch and sections of the Westhoff ranch to the Barnhart brothers. The other partnership and the trust leased the remaining sections of the Westhoff ranch to BRC. BRC issued Forms 1099-MISC, Miscellaneous Income, with respect to its lease payments.

From 1996 onward Kathy Borawski, an accountant of Barnhart Interests, Inc. (or possibly Barnhart Co.), served as controller for the family businesses, preparing individual financial statements for Barnhart family members, preparing

**[*8]** their returns, and supervising other accountants charged with similar tasks. She and other accountants continued providing services of joint interest billing for the cattle operation, which was charged for those services. Barnhart Interests, Inc., a corporation whose president for the last three decades has been petitioner, is involved in the construction of office buildings and retail shopping centers. (The Barnhart brothers have been partners, shareholders, members, and/or directors (and/or, in petitioner's case, registered agent) of multiple corporations, limited partnerships, and limited liability companies as well as partners of the McDermott-Barnhart Partnership, a passthrough entity that owns and manages McDermott-Barnhart ranch, a cattle ranching operation consisting of approximately 1,434 acres in Highlands, Texas.)

Typically, and for all years in issue, BRC and the cattle operation financially operated as described in the following three paragraphs:

The cattle operation paid expenses that included, inter alia, feed and other ranch supplies, payroll, maintenance and repairs, and lease rentals on the acreage used for the operation. An expense of the cattle operation was booked to BRC as a receivable--50% from petitioner and 50% from his brother. Then a monthly joint-interest-billing invoice was prepared for each of the Barnhart brothers, listing the expenses and billing each for his one-half share; no charge was billed for the

[*9] services that BRC provided. Also prepared for each of the Barnhart brothers was an invoice regarding personal expenses that had been paid by BRC on their behalf. Each of the Barnhart brothers paid the amount due shown on each of his invoices, and those funds were deposited in a bank account in the name of BRC (BRC account).

As manager of the cattle operation, Sronce paid some of the business expenses and some of the Barnhart brothers' personal expenses from a second bank account in the name of "Barnhart Co. Barnhart Ranch Account" (Barnhart Co. account). The BRC account was used to pay the remaining cattle operation expenses and personal expenses; however, it was also used to reimburse the Barnhart Co. account for the expenses paid from it. The BRC account also provided payroll for the cattle operation and funded various other expenditures, including payments made directly to Barnhart Interests, Inc.

Receipts for sales of cattle sold by BRC were deposited into the BRC account. When these sales deposits were entered, half of the revenue was booked directly into the general ledger of each of the Barnhart brothers and a payable was created on BRC's books through the joint interest billing system. All income from the sale of cattle was split equally between the Barnhart brothers. If total income exceeded expenses in a month, accountants prepared: (1) vouchers showing each

[*10] of the Barnhart brothers as a vendor, (2) invoices for the brothers reflecting a credit of one-half of the excess to each of them, and (3) corresponding account payable invoices for BRC. The Barnhart brothers would then each receive a check from the BRC account in the amount shown on his invoice. This convention of BRC's transmitting of its remaining income to the Barnhart brothers would require the latter, when necessary, to advance funds to BRC so that it could pay subsequent expenses.

In 1995 the Internal Revenue Service (IRS) audited Barnhart Co.'s return for its tax year ended May 31, 1994. The 1994 return had reported gross receipts or sales of $775,489 and total income of $778,593 and claimed a salaries and wages deduction of $442,011 and other deductions for repairs, rents, depreciation, advertising, and other expenses that totaled $777,559, resulting in taxable income of $994. The IRS auditor ascertained that Barnhart Co.'s purposes were to manage the family businesses, including the cattle operation, and to serve as a "liability shield" for the Barnhart family. He determined that Barnhart family individuals, including the Barnhart brothers, owned the "family enterprises", and he concluded that income generated therefrom belonged to those family members. After reviewing Barnhart Co.'s accounting records, he determined that all gross

[*11] receipts had been properly reported, and, in accordance with this result, the IRS issued Letter 590 (DO), a "no-change" letter.

In 2006 the IRS examined the 2003 and 2004 returns of Irvin Barnhart. The audit covered, inter alia, interest income, dividends, partnership distributions, loans, capital gains and losses, supplemental income and loss, and gross receipts for the family businesses and from leasing real estate. For those same audit years the examining agent identified 29 entities related to Irvin Barnhart and requested to inspect the returns of any related party that had transactions with him during that period, which included BRC. With respect to expenses reported on Schedules C, Profit or Loss From Business, that pertained to the cattle operation, the examining agent particularly noted a tractor cost of $13,406 and repairs and maintenance of $14,470; she did not, however, open an exam on BRC. At the examination's conclusion, the IRS issued a no-change letter to Irvin Barnhart.

In 2007 the Barnhart brothers' father died. At some point before or around that time, the Barnhart brothers had taken over the oil and gas operation.

BRC timely filed Forms 1120, U.S. Corporation Income Tax Return, for its 2012 and 2013 tax years. Both Forms 1120 reported no gross receipts or sales and no (or negative) taxable income; total income was $7,631 for 2012 and $2 for 2013. BRC claimed expense deductions of $754 for 2012 (regarding only "other

[*12] expenses" of bank service fees and supplies) and $2,502 for 2013 (regarding only "other expenses" of bank service charges and liability insurance). Schedule K, Other Information, of each return described BRC's business activity and service as "Mgmt of Cattle Ranch" and identified the business activity code as 112111, which designates "Beef Cattle Ranching & Farming". "Barnhart C o" was listed as the paid preparer of these returns, and Irvin Barnhart, as vice president of BRC, had signed the jurats, declaring to the best of his knowledge that the statements made within the returns were true, correct, and complete.

The other petitioners filed Forms 1040, U.S. Individual Income Tax Return, for their years in issue. On Schedules C they reported the gross receipts and expenses (other than those claimed by BRC) from the cattle operation and identified the principal business as code 112900, designating "animal production". They offset other income with the cattle operation's net losses of approximately $860,000 for 2010, $685,000 for 2011, and $970,000 for 2012. They did not deduct personal expenses that had been paid on their behalf by BRC.

Around 2014 the IRS audited petitioners' returns for their respective years in issue. Petitioners provided any substantiation that the IRS requested, and they cooperated with reasonable requests for witnesses, information, documents, meetings, and interviews.

**[\*13]** Irvin Barnhart died on March 17, 2015. Petitioner was appointed as the independent executor of his estate.

OPINION

Generally, the taxpayer has the burden of proving that the Commissioner's determinations in a notice of deficiency are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, if a taxpayer produces credible evidence to support her or his position as to a factual issue, complies with substantiation requirements, and cooperates with the Secretary with regard to all reasonable requests for information, then the burden of proof as to that issue shifts to the Commissioner. Sec. 7491(a); see Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).

Petitioners argue that the Barnhart brothers, and not BRC, owned all the cattle during the years in issue and, thus, that they properly reported the income and expenses of the cattle operation on their own returns--just as their father had previously done for decades. They have shown that the Barnhart brothers owned at least the cattle transferred to them by their father and purchased by them from their sister (original cattle) before BRC was created.

With regard to the burden of proof, respondent counters that petitioners failed to keep, thus produce, records showing that the cattle managed and sold

[*14] during the years in issue were the original cattle or cattle descended therefrom and that the cattle sold could have been those purchased by BRC in its own name. A prolonged discussion of burden of proof, however, is unnecessary because we are able to decide these cases on the preponderance of the evidence. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008) ("In a case where the standard of proof is preponderance of the evidence and the preponderance of the evidence favors one party, we may decide the case on the weight of the evidence and not on an allocation of the burden of proof."); see also Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66, aff'd, 431 F. App'x 544 (9th Cir. 2011).

Absent extraordinary circumstances a corporation's business is not attributable to its shareholders for tax purposes. See Burnet v. Clark, 287 U.S. 410, 415 (1932). Generally, when taxpayers choose to conduct business through a corporation, they will not be permitted subsequently to deny the existence of the corporation if it suits them for tax purposes. See Moline Props., Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943) (recognizing the corporate form for tax purposes even where the corporation involved was completely dominated by its shareholder and appeared to lack beneficial ownership of its assets and income). Exceptions exist where the creation of the corporation was not followed by any business activity, the purpose of creating the corporation was not a

[*15] business purpose, or the corporation was the agent of the taxpayers. See Commissioner v. Bollinger, 485 U.S. 340, 344 (1988); Moline Props., Inc. v. Commissioner, 319 U.S. at 438-439.

The parties agree that BRC had a genuine business purpose and actually carried on business activity and is therefore a separate taxable entity. See Tomlinson v. Miles, 316 F.2d 710, 714 (5th Cir. 1963) (observing that Moline Properties introduced the alternative requirements of business purpose or business activity to show a separate corporate entity). They disagree, however, over what that purpose was. Respondent asserts that BRC managed the cattle operation. Petitioners contend that BRC was nothing more than a "joint interest accounting agent" of the Barnhart brothers.

It is unclear from testimony and other evidence what petitioners mean when they describe BRC as an "accounting agent", i.e., whether they are attesting that BRC actually performed the joint interest billing for the cattle operation or whether it was used simply as a strawman to provide a temporary repository for the operation's income and expenses to accomplish joint interest billing. Other than self-serving testimony--which we need not and do not accept, see Tokarski v. Commissioner, 87 T.C. 74, 77 (1986)--the evidence does not show that BRC actually provided accounting services. (Borowski, the only accountant that

[*16] testified about BRC's accounting practices, appeared to be an employee of Barnhart Interests, Inc., or, less likely, Barnhart Co.)  To the contrary BRC appears to have been charged for receiving accounting services.

Regardless of how BRC may have provided an accounting function, any such function would have been only one aspect of its overall business purpose, to manage the cattle operation.  BRC's 2012 and 2013 Federal tax returns (contemporaneously executed by BRC's vice president Irvin Barnhart under sworn jurats) directly identify its business activity and service as "Mgmt of Cattle Ranch".  BRC bought and sold cattle under its own name during the years in issue. It also, in its own name and carrying out cattle operation business, held a bank account, purchased and held titles to vehicles, leased ranch property, and held ranch and workers' compensation and employer's liability insurance policies. BRC paid for the services of a ranch manager and ranch hands, and it handled their employment tax and income tax documents.  Any control over these employees by the Barnhart brothers would presumably have been exercised by them not as individuals but in their roles as officers of BRC, and the record does not show otherwise.  Having determined that BRC's business purpose and activity was the management of the cattle operation, we now consider the issue of to whom

[*17] the income, expenses, and resulting net losses of the cattle operation are attributable.

Ownership

A fundamental purpose of the Code is to tax income to those who earn or otherwise create the right to receive it and enjoy the benefit of it. See Helvering v. Horst, 311 U.S. 112, 119 (1940); Lucas v. Earl, 281 U.S. 111, 115 (1930). Income from property is usually attributed and taxed to the person who, in substance, is the owner of the property generating the income. See Helvering v. Horst, 311 U.S. at 117-120; Britt v. United States, 431 F.2d 227, 229 (5th Cir. 1970).

"For tax purposes, '[t]he true owner of income-producing property . . . is the one with beneficial ownership, rather than mere legal title. It is the ability to command the property, or enjoy its economic benefits, that marks a true owner.'" Salty Brine I, Ltd. v. United States, 761 F.3d 484, 492 (5th Cir. 2014) (alteration in original) (quoting Chu v. Commissioner, T.C. Memo. 1996-549, slip op. at 9 (citations omitted)). Since Moline Properties, corporate entity cases dealing with income-producing property have essentially attributed such property's income and expenses to the corporation instead of its shareholders where: (1) the corporation has held some type of title to that property, see, e.g., Miles, 316 F.2d at 714 (holding that a corporation owed income tax on the basis of its being the holder of,

**[*18]** as its shareholders contended, "mere naked record title with neither legal nor equitable ownership" of a real property); or (2) the shareholders have held the corporation out to others as the owner of that property, see, e.g., Jeyapalan v. Commissioner, T.C. Memo. 2000-207, slip op. at 8-9 (determining that a subchapter S corporation had to recognize its tax obligation arising from income produced by an apartment complex where the owner-shareholders, who never formally transferred the property, caused the corporation to hold itself out to the public as the legal entity that owned and operated the complex).

With respect to ownership of the cattle, respondent points to United States v. Creel, 711 F.2d 575 (5th Cir. 1983), wherein the Court of Appeals for the Fifth Circuit applied the separate-entity principle of Moline Properties to a bankruptcy case with a fact pattern quite close to the fact pattern in these cases. Initially, a bankruptcy court had found that a sole shareholder had created a subchapter C corporation for the purpose of managing a ranch and cattle that he owned. It also found that the shareholder, serving as president and general manager, had completely dominated, controlled, and managed the corporation's assets, business transactions, and affairs. The cattle management corporation incurred a loss of approximately $2.2 million. The bankruptcy court, as affirmed by a Federal District Court, determined that the corporation was an alter ego of the shareholder

**[\*19]** for all purposes and, as a result, attributed the cattle operation loss to the shareholder personally rather than the corporation.

The Court of Appeals, however, reversed the lower courts, holding that the corporation's alter ego status for bankruptcy purposes did not affect its separate taxability for Federal tax purposes. The loss from the cattle business, it held, belonged to the corporation despite its being completely controlled by the shareholder and despite the shareholder's ownership of the ranch and cattle. (The Court of Appeals found that the corporation had held record title to at least some of the cattle.)

BRC had command over the cattle to the degree that it was the recognized seller and purchaser of this income-producing property as shown in the record. It deposited all income from the cattle sales into its BRC account, directly paid cattle operation expenses from that account, and even exercised its power of ownership over the funds by directing payment of the excess thereof to its stockholders--all recognizable economic benefits. See Floyd v. Scofield, 193 F.2d 594, 596 (5th Cir. 1952) (agreeing that a corporation was the owner of income from product sales because, inter alia, checks were made payable to and delivered to the corporation, and it had the choice either to collect the funds itself or to direct the payment thereof to its shareholders); see also Helvering v. Horst, 311 U.S. at 118

[*20] ("The power to dispose of income is the equivalent of ownership of it. The exercise of that power to procure the payment of income to another is the enjoyment and hence the realization of the income by him who exercises it."). BRC held significant control over the cattle.

Moreover, the Barnhart brothers caused BRC to hold itself out to the public, including the livestock auctions and other brokers, buyers, sellers, and vendors, as the legal entity that owned the cattle--either by its direct purchase of the livestock or by its right to sell them. Nothing in the record indicates that petitioners took any steps to make third parties aware that the cattle were not owned by the selling/buying corporation, BRC.

Petitioners argue that the Barnhart brothers are synonymous with BRC and that all the local vendors and buyers that they do business with understand that a business transaction with BRC is actually a transaction with the Barnhart brothers. The Barnhart brothers, however, chose to do business using a separate corporate entity; they benefited from that choice, e.g., limited liability; therefore, they may not disregard the corporation whenever it is beneficial for them to do so. See Moline Props., 319 U.S. at 438-439. In considering all the evidence we are satisfied that the Barnhart brothers sufficiently held BRC out to others as the owner of the cattle during the years in issue and that BRC had significant control

[*21] over the cattle. BRC is therefore deemed to be the owner of the cattle for Federal tax purposes and, as a separate taxable entity, is the taxpayer to whom the net losses that stemmed from those assets for its years in issue are attributable. See Helvering v. Horst, 311 U.S. at 116-117.

Agency

Petitioners alternatively argue that the cattle operation losses are nonetheless attributable to the Barnhart brothers as individuals because the corporation functioned only as their agent. An exception to the separate taxable entity principle exists where a corporation serves as the agent of the taxpayers. See Commissioner v. Bollinger, 485 U.S. at 344-347. Generally, if a corporation was merely the shareholders' agent, then income or expenses generated by the corporation's assets would be income and expenses of the shareholders as principals. Id.

In Nat'l Carbide Corp. v. Commissioner, 336 U.S. 422 (1949), the Supreme Court concluded that three corporations that were wholly owned subsidiaries of another corporation were not really its agents. The Supreme Court acknowledged, however, that there was such a thing as "a true corporate agent * * * of its owner-principal" and set forth four indicia and two requirements of agency (what are now known as the six National Carbide factors): (1) whether the corporation

[*22] operates in the name and for the account of the principal; (2) whether the corporation binds the principal by its actions; (3) whether the corporation transmits money received to the principal; (4) whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal; if the corporation is shown to be a true agent, then (5) its relations with its principal must not be dependent upon the fact that it is owned by the principal; and (6) its business purpose must be the carrying on of the normal duties of an agent. Id. at 437.

In Commissioner v. Bollinger, 485 U.S. at 349-350, the Supreme Court clarified its view of the National Carbide factors by stating:

> In any case, we decline to parse the text of National Carbide as though that were itself the governing statute. As noted earlier, it is uncontested that the law attributes tax consequences of property held by a genuine agent to the principal; and we agree that it is reasonable for the Commissioner to demand unequivocal evidence of genuineness in the corporation-shareholder context, in order to prevent evasion of Moline. * * * It seems to us that the genuineness of the agency relationship is adequately assured, and tax-avoiding manipulation adequately avoided, when the fact that the corporation is acting as agent for its shareholders with respect to a particular asset is set forth in a written agreement at the time the asset is acquired, the corporation functions as agent and not principal with respect to the asset for all purposes, and the corporation is held out as the agent and not principal in all dealings with third parties relating to the asset.
> * * *

**[\*23]** This Court has found that the indicia put forward in <u>Bollinger</u> (like that in <u>National Carbide</u>) are not dispositive requirements for agency status but rather factors which lead to the conclusion that agency status existed in any given case. See <u>Advance Homes, Inc. v. Commissioner</u>, T.C. Memo. 1990-302, 59 T.C.M. (CCH) 906, 909 (1990) (concluding that <u>Bollinger</u> does not require the existence of a written agency agreement). We therefore consider factors, addressed by the parties, to determine whether BRC was the agent of the Barnhart brothers.

As initial support petitioners point to two cases: <u>Jarvis v. K & E Re One, LLC</u>, 390 S.W.3d 631 (Tex. App. 2012), and <u>Cowell v. Indus. Accident Comm'n of Cal.</u>, 78 P.2d 1016 (Cal. 1938). They assert that <u>Jarvis</u> upheld the finding that a genuine agency relationship existed where the principals and agent, through their course of conduct, established a usual, customary, and authorized procedure pursuant to which the agent directly received funds and then disbursed those funds to the principals through a check drawn on the agent's operating account.

The gross receipts generated by the cattle operation were, for the most part, not transmitted from BRC to the other petitioners. Receipts for sales of cattle sold by BRC were deposited into the BRC account. BRC then used those funds to pay monthly expenses and to reimburse the Barnhart Co. account. The Barnhart brothers received only the excess of receipts over expenditures and then only

[*24] because of their ownership of the corporation. See Nat'l Carbide Corp. v. Commissioner, 336 U.S. at 438 (determining that money from a corporation was transmitted to the sole shareholder only because of ownership and not as a result of agency).

Petitioners next argue that Cowell is squarely on point with facts establishing that a corporation that managed a stock farm and ranch for the ranch's joint owners--who were also the shareholders of the corporation--did so as their agent. Cowell, however, is not an agency law case but a 1938 California workers' compensation case that primarily considered whether the joint owners of the farm and ranch, along with the corporation, were the employers of a deceased employee. While the court in Cowell agreed with the Industrial Accident Commission's determination that certain indicia pointed to an agency relationship, it did so without applying or citing any law or authority that would be applicable in these cases. As a source of general agency indicia, the Cowell case is understandably subordinate in authority to the subsequent Supreme Court cases National Carbide and Bollinger.

Petitioners thus go on to address the National Carbide factors, first claiming that BRC operates in the name and for the account of the Barnhart brothers. They reach this assertion primarily because ranch transactions and revenues were

[*25] booked into the joint account billing system as receivables and payables in the Barnhart brothers' names. These entries, however, do not show that BRC acted as an agent in the name of the Barnhart brothers as principals. To the contrary the record shows that BRC acted for its own account. It incurred its own debts, entered into its own contracts with third parties for the purchase of goods and services, and bought and sold cattle in its own name--not as an agent.

Petitioners allege that the Barnhart brothers are liable for the expenses of the cattle operation and that any expenses incurred by BRC become their liability. They offered no proof of this allegation, referring only to questionable testimony and stipulations that the ranch expenses are booked to BRC as receivables from the Barnhart brothers with the latter paying any amount due to BRC. The Barnhart brothers' payment of invoices regarding BRC does not establish that they were personally bound by BRC's actions or liable on its debts.

Petitioners maintain that BRC "automatically transmits all the ranch income it receives" to the Barnhart brothers. However, as already discussed, the gross receipts generated by the cattle operation, for the most part, were not transmitted from BRC to the other petitioners. This factor does not weigh in favor of petitioners.

**[\*26]** Regarding the indicium of whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal, petitioners argue that BRC's receipt of income was attributable to the sale of cattle owned by the Barnhart brothers. We have determined that the cattle were, or were held out to be, assets of BRC; thus, any cattle operation income that the Barnhart brothers eventually received is not attributable to assets that they owned as principals or individuals. Petitioners make no correlation between the income from cattle sales and the services of the ranch employees. Ultimately, none of the four indicia of agency considered in National Carbide appears to be present.

Petitioners also address the agency indicia raised in Bollinger. With respect to an agency agreement, petitioner testified that "when * * * [the Barnhart brothers] formed Barnhart Ranch Company we made an oral agreement that it would act only as our agent, it would provide the accounting functions that we talked about, that it would own neither cattle nor any of the ranch lands that we were operating on." This uncorroborated testimony is not persuasive, especially in the light of petitioners' insistence that BRC was nothing more than an accounting device. As there was no written agreement and no proven oral agreement, this factor also does not weigh in petitioners' favor.

[*27] Petitioners next argue that BRC functioned as an agent and not a principal with respect to the cattle because "[t]here is no evidence to the contrary." BRC, however, performed the nitty-gritty of the cattle operation, and it acted as the controlling entity with respect to the cattle. Moreover, any instructions that the Barnhart brothers gave to BRC regarding the cattle would most likely have been in their capacity as officers of BRC, and the record does not reflect otherwise. Thus, BRC did not serve as an agent with regard to the cattle.

Winding up their Bollinger analysis petitioners claim that BRC was not held out as the principal in dealings with third parties relating to the cattle. They assert that the employees on the ranch viewed the Barnhart brothers, and not BRC, as the owners of the cattle operation and that vendors who did business with the cattle operation knew that the Barnhart brothers, and not BRC, would honor any business obligation. Again, it is unclear how the employees differentiated between the Barnhart brothers' acting as officers of BRC and their acting on their own as principals. Additionally, the record has several examples of how BRC appeared to be the principal at auctions and with buyers, sellers, and vendors. The one third-party vendor that appeared as a witness (an insurance broker who sold policies to BRC) testified that he was not informed that BRC was acting as an agent for the Barnhart brothers. Nothing reliable in the record shows that BRC

[*28] was identified to any third parties as an agent, just as nothing shows that the Barnhart brothers were identified as its principals. None of the agency indicia of Bollinger is apparent.

Lastly, petitioners argue that BRC and the Barnhart brothers' use of joint interest billing is "per se evidence" of an agency relationship. They conclude that "joint interest accounting is, by definition, based on the agency relationship between the owners of a business and the corporate entity that manages that business." As authority they cite Jimastowlo Oil, LLC v. Commissioner, T.C. Memo. 2013-195, at *37, for the proposition that a corporation engaging in joint interest accounting "may accurately be described as the common agent of the coowners of each working interest for the purpose of exploiting the appurtenant leasehold" in the oil and gas context. They also rely on the Internal Revenue Manual (IRM) for its recognition that "[a]n agency relationship exists between the operator and the nonoperator" when an oil and gas operator bills joint owners of a well for their share of the expenses. IRM pt. 4.41.1.2.4.5.4 (1) (July 31, 2002, & rev. as IRM pt. 4.41.1.2.4.7.4(1) (see IRS Manual Transmittal 4.41.1 (Dec. 3, 2013))).

Petitioners' reliance on these authorities is misplaced. Jimastowlo Oil addresses joint ventures (working interests in oil and gas leaseholds) wherein joint

[*29] interest billing was not used with respect to lease operating expenses--a situation not shown here. Jimastowlo Oil, LLC v. Commissioner, at *13-*14. The IRM part is from the IRM's "Oil and Gas Handbook" and addresses the working interests of joint owners that designate an "operator" who normally performs its core duties in accordance with an operating agreement--again, not shown here. IRM pt. 4.41.1.2.4.5.4(1). Both authorities speak to the oil and gas industry, and their relevance with regard to the cattle operation is not apparent. Accordingly, petitioners' "per se" contention is unpersuasive.

The indicia of agency, as posited by petitioners, are not present in these cases. We therefore need not address the two additional requirements of a true agent found in National Carbide. Ultimately, there is no reliable, much less any unequivocal, evidence that BRC acted as the agent of the Barnhart brothers. See Commissioner v. Bollinger, 485 U.S. at 349.

On brief petitioners recognize that they "could have transferred the cattle business to an S corporation or a limited partnership with the same tax result", and in reality they have realized this goal with the McDermott-Barnhart Partnership. For whatever reasons, however, the Barnhart brothers chose to run BRC not as a flowthrough entity but as a corporation. Petitioners "cannot now escape the tax consequences of that choice, no matter how bona fide * * * [their] motives or

**[*30]** longstanding * * * [their] arrangements." Nat'l Carbide Corp. v. Commissioner, 336 U.S. at 438-439. We sustain respondent's adjustments to the returns of petitioner and Karol Ann Barnhart and Irvin Barnhart for their respective tax years in issue, in which they inappropriately reported income and expenses and the resulting net losses of BRC.

In the event that the Court reached this determination--that the cattle operation's income and expenses are attributable only to BRC for its years in issue--the parties anticipatorily stipulated, as follows:

> [T]he parties agree that the following amounts would be allocated from Paul and Irvin to Barnhart Ranch Co., as shown * * *

| Tax Year | Gross Receipts or Sales from Cattle Operations | Expenses from Cattle Operations |
|----------|-----------------------------------------------|--------------------------------|
| Year ended 06/30/2012 | $997,662 | $1,824,682 |
| Year ended 06/30/2013 | 930,830 | 1,683,001 |

> The parties also agree that Barnhart Ranch Co. would have net operating loss carryforward from the fiscal year ending June 30, 2011 to the fiscal year ending June 30, 2012 of $1,129,251.00. In making this agreement, respondent is not agreeing that petitioners have substantiated the expenses allowed by this agreement, as that is not an issue in these cases.

**[\*31]** These stipulated adjustments result in BRC's having no deficiencies and no penalties for its years in issue. Accordingly, we consider penalties only with respect to petitioners other than BRC.

Section 6662(a) Penalties

Respondent determined section 6662(a) penalties for the 2010, 2011, and 2012 tax years of both Irvin Barnhart and, jointly, petitioner and his wife. Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose the penalty. See Higbee v. Commissioner, 116 T.C. at 446. However, once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer, including the burden of proving that the penalty is inappropriate. Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447.

As grounds for the penalties respondent asserts that these petitioners had substantial understatements for both their 2010 and 2012 tax years and, alternatively, were negligent and disregarded rules and regulations for all years in issue. Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any underpayment of Federal income tax attributable to a taxpayer's negligence or disregard of rules or regulations or to a substantial understatement of income tax. Only one accuracy-related penalty may be applied with respect to any given

**[*32]** portion of an underpayment, even if that portion is subject to the penalty on both grounds. Sec. 1.6662-2(c), Income Tax Regs.; accord New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 187 (2009), aff'd, 408 F. App'x  908 (6th Cir. 2010); Nevertheless, we consider both grounds for imposition of the penalties.

Substantial Understatement

An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return, less any rebate. Sec. 6662(d)(2)(A).  An understatement of income tax is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  Respondent has met the initial burden of production because our conclusions as to the deficiencies result in the following substantial understatements:

|  | 2010 | | 2012 | |
|---|---|---|---|---|
|  | 10% tax shown | Understatement | 10% tax shown | Understatement |
| Irvin Barnhart | $74,402 | $150,120 | $142,011 | $171,313 |
| Petitioner & Karol Ann Barnhart | 101,448 | 159,876 | 173,256 | 174,675 |

The burden is on petitioners to prove that the penalties are inappropriate.

Except in cases involving tax shelters, an understatement can be reduced by the portion of the understatement that is attributable to the tax treatment of an item

**[*33]** that is supported by substantial authority or for which there is a reasonable basis and adequate disclosure.  See sec. 6662(d)(2)(B) and (C).  Moreover, the section 6662(a) penalty will not be imposed with respect to any portion of the underpayment to which the taxpayer acted with reasonable cause and in good faith.  Sec. 6664(c)(1); see also Higbee v. Commissioner, 116 T.C. at 448.

Authority, for purposes of determining whether there is substantial authority for a taxpayer's treatment of an item, includes the Code, regulations, caselaw, and certain IRS administrative pronouncements.  Sec. 1.6662-4(d)(3)(iii), Income Tax Regs.  In evaluating whether a taxpayer's position regarding treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions.  Id. subdiv. (i).  The substantial authority standard is objective, and the taxpayer's belief that there is substantial authority for her or his position is irrelevant in determining whether there is substantial authority.  See id.

Petitioners' tax treatment of the income and expenses of the cattle operation was to report those items and the resulting net losses on their returns and not the returns of BRC, to whom the income and expenses were attributable.  Petitioners do not appear to articulate a substantial authority argument other than referring to

[*34] their reliance on prior audits, which is also their argument for having acted with reasonable cause and in good faith. As we address the prior audits below, and as there appears to be no authority supporting the affected petitioners' tax treatment, we conclude that there is no supporting substantial authority.

The determination of whether a taxpayer acted with reasonable cause is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor in determining reasonable cause and good faith is the extent of the taxpayer's effort to assess his or her proper income tax liability. Id.; accord Reser v. Commissioner, 112 F.3d 1258, 1271 (5th Cir. 1997), aff'g in part, rev'g in part T.C. Memo. 1995-572.

Petitioners assert a defense based upon their reliance on the results of the prior IRS audits of Barnhart Co. in 1995, with regard to its 1994 return, and Irvin Barnhart in 2006, with regard to his 2003 and 2004 returns. They cite Bangs v. Commissioner, T.C. Memo. 2006-83, slip op. at 22-24, for the premise that it is reasonable for taxpayers to believe deductions would be permitted where a previous IRS audit did not require any change, and De Boer v. Commissioner, T.C. Memo. 1996-174, slip op. at 27-28, 30 n.12, for the proposition that a taxpayer's return position was reasonable where he had received a no-change

[*35] letter from the IRS. They contend that, similarly, it was reasonable for them to rely on the no-change determinations of the audits that impacted them.

A failure by the Commissioner to disallow similar deductions in a prior year's audit of a taxpayer's return may be a factor to be considered with respect to the imposition of the accuracy-related penalty. See Stewart v. Commissioner, T.C. Memo. 2002-199, slip op. at 10; Sheehy v. Commissioner, T.C. Memo. 1996-334, slip op. at 6. The 1995 audit of Barnhart Co.'s 1994 return, however, was conducted with respect to a taxpayer other than petitioners and included other businesses along with the cattle operation. While the evidence suggests that the cattle operation was more or less run in a traditional manner over the years, they do not show that Barnhart Co. and BRC performed tax reporting in the same way.

The 1994 tax return for Barnhart Co. reflected approximately $778,000 in total income, with $775,000 being from gross receipts, and deductions for salaries, repairs, rents, depreciation, advertising and other items totaling around $777,000. By comparison, BRC's returns for the years in issue reported no gross receipts, reported negligible income ($7,631 for 2012 and $2 for 2013), and claimed minimal expense deductions ($754 for 2012 and $2,502 for 2013) that were for bank service fees, supplies, and liability insurance. Cf. Stewart v. Commissioner, slip op. at 9-10 (determining that the taxpayers' reliance on a no-change letter was

[*36] unreasonable where they failed to show that facts in one tax year were comparable to those that existed a decade later). These notable differences in tax reporting have not been explained and undermine petitioners' position.

The audit of Irvin Barnhart's 2003 and 2004 returns actually considered the related returns of BRC for those same periods. The parties, however, did not provide any of those returns, making it impossible to tell whether they are discordant with the respective returns for the years in issue, similar to what was revealed above with the 1994 Barnhart Co. return. For these reasons we are unpersuaded that petitioners' reliance on the two previous audits is reasonable.

Additionally, other, more substantial determinants demonstrate that petitioners did not act with reasonable cause and in good faith. As stated, "[t]he most important factor is the extent of the taxpayer's effort to assess his [or her] proper liability in light of all the circumstances." Brinkley v. Commissioner, 808 F.3d 657, 669 (5th Cir. 2015) (quoting Klamath Strategic Inv. Fund v. United States, 568 F.3d 537, 548 (5th Cir. 2009) for its affirmation of section 1.6664-4(b)(1), Income Tax Regs.), aff'g T.C. Memo. 2014-227. We examine this factor along with

> [a]dditional "[c]ircumstances that may indicate reasonable cause and
> good faith [that] include [(1)] an honest misunderstanding of fact or
> law that is reasonable in light of all the facts and circumstances,

**[\*37]** including the experience, knowledge, and education of the taxpayer," Treas. Reg. § 1.6664-4(b), and (2) reliance on the advice of a professional tax advisor "if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith," id.

Stanford v. Commissioner, 152 F.3d 450, 461 (5th Cir. 1998) (alteration in original) (quoting Reser v. Commissioner, 112 F.3d at 1271), aff'g in part, vacating in part 108 T.C. 344 (1997).

Petitioners did not present any evidence that the Barnhart brothers took appropriate steps to ensure that the Federal tax reporting that they adopted for BRC and themselves was correct--only that it was longstanding. A different reporting method was used on the BRC returns for the years in issue than had been used on the Barnhart Co. return that is in the record. When creating BRC, or at some point thereafter, the Barnhart brothers apparently made a decision to alter their reporting method, thus removing income, salaries, and other business expenses from the corporate return.

The record is silent as to what measures, if any, petitioners took to assess that they would reach their proper Federal tax liabilities through this method. Borowski testified that the accounting system was already in place before she was employed, and no testimony was elicited regarding the Barnhart brothers' having asked her, other employee-accountants, or third-party tax professionals for their

[*38] advice regarding the propriety of their Federal tax reporting. Cf. McLauchlan v. Commissioner, 558 F. App'x 374, 381 (5th Cir. 2014) (affirming the Court's judgment in sustaining a section 6662(a) penalty where a well-educated, experienced attorney-taxpayer had failed to seek the assistance of a tax professional yet prepared his own Federal income tax returns wherein he had repeatedly disregarded the rules and regulations on reporting income and claiming deductions), aff'g per curiam but remanding for recalculation of deficiencies and penalties T.C. Memo. 2011-289.

For the years in issue the Barnhart brothers were shown to have been savvy businessmen with an established background of having created and participated in several types of entities that dealt with multiple kinds of businesses. Cf. Prudhomme v. Commissioner, T.C. Memo. 2008-83, slip op. at 13 (sustaining a section 6662(a) penalty where the taxpayers were found to be successful business people yet they did not make any effort to determine whether all items of income were included on the return), aff'd per curiam, 345 F. App'x 6 (5th Cir. 2009). The Barnhart brothers were partners in the McDermott-Barnhart Partnership, running a similar cattle ranching enterprise but using a flowthrough entity for the desired tax result. They had knowledge and experience sufficient enough that they should have recognized that they could have obtained the same tax result for their

**[*39]** own cattle operation by transferring it to a subchapter S corporation or a partnership; yet, they did not do so and did not question how they achieved this flowthrough result using their subchapter C corporation.

Petitioners have not shown any genuine attempt to assess their proper Federal tax liabilities for the years in issue, and their position of relying on previous audits as their reason for their reporting in this manner is neither reasonable nor a good-faith effort. On the basis of substantial understatement, we sustain the accuracy-related penalties as to the affected petitioners' 2010 and 2012 tax years and move on to deliberate the ground of negligence.

Negligence

Section 6662(c) defines negligence as including any failure to make a reasonable attempt to comply with the provisions of the Code and defines disregard as any careless, reckless, or intentional disregard. See sec. 1.6662-3(b)(1) and (2), Income Tax Regs. Negligence is the lack of due care or the failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985) (citing Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g in part, remanding in part 43 T.C. 168 (1964) and T.C. Memo. 1964-299. Disregard of rules or regulations is careless if the taxpayer does not exercise reasonable diligence to

[*40] determine the correctness of a return position that is contrary to the rule or regulation. Sec. 1.6662-3(b)(2), Income Tax Regs. Once more the Commissioner bears the burden of production. Sec. 7491(c).

In the light of the established separate-entity principle of Moline Properties, respondent argues that petitioners, other than BRC, negligently disregarded the Barnhart brothers' choice of corporate form for BRC. We agree that, in reporting for themselves the income, expenses, and net losses of a subchapter C corporation for the years in issue--with no relationship of agency--petitioners, other than BRC, acted negligently and disregarded the Code. Respondent has met the burden of production.

Petitioners advance no reasonable cause other than their reliance on previous audits, which we have determined to be lacking. See, e.g., Green v. Commissioner, 507 F.3d 857, 872 (5th Cir. 2007) (determining no clear error where the Court upheld accuracy-related penalties on the basis of negligence and the taxpayer failed to show reasonable cause), aff'g T.C. Memo. 2005-250. We therefore sustain the accuracy-related penalties on the basis of negligence for all years in issue with respect to petitioners other than BRC.

We have considered other arguments of the parties, but they are irrelevant, unsupported by the record or by authority, or otherwise without merit. To reflect

**[*41]** the foregoing, and to give effect to the parties' stipulated adjustments that result in no deficiency and no penalty for the 2013 tax year in docket No. 19458-14,

Decision in docket No. 19458-14 will be entered under Rule 155.

Decisions in docket Nos. 19459-14 and 19460-14 will be entered for respondent.